IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| TRINITY LUTHERAN CHURCH OF COLUMBIA, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 2:13-CV-04022-NKL |
| v. | ) ) ) | |
| SARA PARKER PAULEY, in her official capacity as Director of the Missouri Department of Natural Resources Solid Waste Management Program, | ) ) ) ) ) | |
| Defendant. | ) ) | |

## ORDER

Defendant Sara Parker Pauley, in her official capacity as Director of the Missouri

Department of Natural Resources Solid Waste Management Program ("Department"),

moves to dismiss the Complaint of Plaintiff Trinity Lutheran Church of Columbia, Inc.

("Trinity"). [Doc. # 9]. For the reasons set forth below, Pauley's motion to dismiss is

GRANTED and this case is DISMISSED, with prejudice.

I.     **Background**

Trinity is a church that operates a preschool and daycare called the Learning

Center. The Learning Center is a ministry of the church and incorporates daily religious

instruction. Through the Learning Center, Trinity teaches a Christian world view to the

children enrolled in these programs, including the Gospel. The Learning Center 's policy

is to admit students of any sex, race, color, religion, nationality, and ethnicity.

1

The Department of Natural Resources Solid Waste Management Program runs the Scrap Tire Program, which competitively awards grants to qualifying organizations for the purchase of recycled tires to resurface playgrounds. Due to the limited funds available for this program, the Department grades and ranks the applications it receives and only gives grants to those organizations that best serve the program's purposes. Both public and private nonprofit day care centers and other nonprofit entities are eligible to submit grant applications. However, the Department has a policy that prohibits organizations from participating if the applicant is owned or controlled by a church, sect or denomination of religion. It contends that this policy is consistent with Article 1, Section 7, of the Missouri Constitution which prohibits public money being used to aid religion.

Seeking to improve the safety of the surface area of its playground, Trinity, through the Learning Center, applied for a grant under the 2012 Scrap Tire Program. Trinity's grant application was graded and ranked fifth out of forty-four applications. Although a total of fourteen grants were awarded in 2012, Trinity's grant application was denied because of the Department's policy to not give grants to religious organizations.

Trinity now sues Pauley, who is named solely in her official capacity as the Director of the Missouri Department of Natural Resources Solid Waste Management Program. Trinity's Complaint claims that the denial of its grant application violated Article I, Section 7 of the Missouri Constitution, the Equal Protection Clause of the Fourteenth Amendment and the Free Exercise, Establishment and Free Speech Clauses of the First Amendment.

2

## II.    Discussion

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Pauley moves to dismiss Trinity's Complaint for failure to state a claim.  When considering a motion to dismiss, the Court must accept as true the factual allegations contained in the complaint, and draw all reasonable inferences in favor of the plaintiff.  *See Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012).

### A.    Missouri Constitution Article I, Section 7

Trinity claims that when the Department refused to allow it to participate in the Scrap Tire Program, the Department impermissibly discriminated against Trinity in violation of Article I, Section 7 of the Missouri Constitution.  Section 7 provides "[t]hat no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof . . .; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship."  Mo. Const. art. I, § 7.

Trinity relies on the second clause of Section 7 for the proposition that the Department cannot deny Trinity funding merely because it is a church as this would be discrimination toward a religious organization.  Pauley counters that both parts of Section 7, the prohibition on state aid to a church and the prohibition on discrimination against a church, must be read in harmony.  Since state aid to a church is prohibited in the first clause, Pauley contends that the State's refusal to give aid to religious organizations could not constitute discrimination contemplated by the second clause.  Instead, the

second clause prohibits preference for or discrimination between religious sects or denominations.

It is a basic rule of statutory construction that each section of a statute must be interpreted in harmony with all sections of the statute. *Frye v. Levy*, No. SD 32307, 2013 WL 1914393, at *4 (Mo. App. S.D. May 9, 2013). The same principle applies to constitutional construction. *See Boone Cnty. Court v. State*, 631 S.W.2d 321, 324 (Mo. 1982). Section 7 contains two provisions—the prohibition on direct or indirect public aid to a church and the prohibition on discrimination against a church. Construing both clauses in harmony, it is not possible to read Section 7 to prohibit public aid to a church while concurrently considering denial of that aid to be discriminatory. Such a reading is inconsistent with the entirety of Section 7. Therefore, the Court concludes that a Missouri court addressing this issue would find that when a state complies with the directive in clause one of Section 7 (no aid to religious organizations), it does not violate the second clause (discrimination against religion). Thus, the next issue is whether the first clause of Section 7 would be violated if funding were given to Trinity.

Trinity contends that the Scrap Tire Program grants are not public funds expended in direct or indirect aid to a church and, therefore, giving it a grant would not violate the anti-aid provision of Section 7. At oral argument, Trinity put forth a "quid pro quo" theory of aid based on the premise that both parties to a contract have mutual obligations. Trinity argues that while the State provides funds for the purchase of the scrap tires and delivery, Trinity is contractually bound to promote the Scrap Tire Program and educate the public about the benefits of recycling. Indeed, Trinity argues that acceptance of the

4

funding will actually result in a greater burden to Trinity because it must find a scrap tire vendor and install the materials at its own cost. Additionally, Trinity contends that the receipt of such funds will actually aid the State by reducing landfills and decreasing pollution. In essence, Trinity argues that if public funding will result in additional obligations (advertising the Program and educating the public) and additional financial burdens (installing scrap tires) for the recipient, then such funding is merely quid pro quo and not public aid within the meaning of Section 7.

In developing this quid pro quo theory Trinity relies upon its reading of the Missouri Supreme Court case *Americans United v. Rogers*, 538 S.W.2d 711 (Mo. 1976). In that case, the Court upheld a state statute directing tuition grants to college students attending approved public or private colleges, including private religious colleges, so long as the educational training received was non-religious in nature. *Id.* at 713-14. The grant program did not directly pay the funds to private institutions; rather, the students received an individual check and would then endorse it over to the institution of their choice, so long as that institution had an independent board and a policy of academic freedom. *Id.* at 715, 720-21. Trinity references a passage in *Americans United* in which supporters of the tuition grant program argued that the grants did not constitute "aid" because they did not fully cover the cost of the students' education and the institutions receiving the grants did not make a profit. *Id.* at 721. In other words, according to *Americans United*, the tuition grants "were not gifts or donations by the students to the institutions, but were the quid pro quo in return for which the institutions were contractually required to make available the opportunities for the students to obtain a

5

college education....[T]he cost to each institution of furnishing to its students their educational opportunities is always far greater than the amount of tuition received." *Id.*

At oral argument, Trinity maintained that this passage represented the Missouri Supreme Court's holding that quid pro quo exchanges of public funding in return for obligations to utilize such funding in a prescribed manner cannot be considered "aid" under Section 7. However, Trinity grossly misrepresents the Missouri Supreme Court's analysis and holding in that case. The Missouri Supreme Court merely quoted an argument presented by supporters of the tuition grant program and did not approve or in any way advance that argument. Instead, it found that the statute in question did not violate Section 7 because the students directly received the tuition grants from the state and could only attend schools with independent boards not under the control of a religious creed or church. *Id.* at 720-21. In the interests of judicial deference to the legislative process, the Missouri Supreme Court found that the tuition grant program "embod[ied] the will of the people." *Id.* at 721. This Court has not found nor has Trinity cited any Missouri case that defines Section 7 "aid" according to Trinity's quid pro quo theory, and the Court is unpersuaded that such a definition would make any sense given the complex factual disputes and nuanced judgments that such a definition would precipitate.

Furthermore, there is a long tradition of Missouri state courts recognizing a "high wall of separation between church and state" based on the state constitution. *A.B. v. Liberty United Methodist Church*, No. WD 59922, 2002 WL 31890054, at *5 (Mo. App. W.D. 2002). The Missouri Supreme Court has long interpreted the State's constitution to

6

be "more 'restrictive' than the First Amendment to the United States Constitution in prohibiting expenditures of public funds in a manner tending to erode an absolute separation of church and state." *Ams. United,* 538 S.W.2d at 720; *accord St. Louis Univ. v. Masonic Temple Ass'n of St. Louis*, 220 S.W.3d 721, 729 (Mo. 2007). *See also Paster v. Tussey*, 512 S.W.2d 97, 101-02 (recognizing that the Missouri Constitution's requirement of separation of church and state is "not only more explicit but more restrictive" than that of the United States); *Berghorn v. Reorganized Sch. Dist. No. 8*, 260 S.W.2d 573, 582-83 (Mo. 1953) (finding that Missouri has an "unqualified policy…that no public funds or properties, either directly or indirectly, be used to support or sustain any school affected by religious influences or teachings or by any sectarian or religious beliefs or conducted in such a manner as to influence or predispose a school child towards the acceptance of any particular religion or religious beliefs.") (internal quotations omitted).

In light of the higher wall of separation between church and state present in the Missouri Constitution, the Missouri Supreme Court has, on multiple occasions, strictly interpreted Section 7 to prohibit public funding of religious institutions. The Missouri Supreme Court's reasoning has persisted since its early inception in *Harfst v. Hoegen*, 163 S.W.2d 609 (Mo. 1941), where the Missouri Supreme Court asserted that Section 7 contained an "explicit interdiction of the use of public money" for religious instruction. *Id.* at 613-14. In *Harfst*, the State took over a parochial school and brought it into the public school system to be funded as such. *Id.* at 610. However, the school retained several aspects of its parochial origins, such as renting the school building from the

church, employing teachers from the church, and incorporating religious curriculum into daily instruction. *Id.* at 614. The teachers expressly acknowledged that their faith required them to instruct the students in the tenets of their religion. *Id.* at 614. The Missouri Supreme Court held that the use of public funds for this school would violate Section 7, stating that the "constitutional policy of our State has decreed the absolute separation of church and state, not only in governmental matters, but in educational ones as well." *Id.*

The Missouri Supreme Court has followed this line of reasoning to find various categories of public aid to religious institutions impermissible that may have otherwise been allowed under the Federal Constitution. For example, it deemed the use of public funds to transport students to parochial schools to be unconstitutional in *McVey v. Hawkins*, 258 S.W.2d 927 (Mo. 1953), while the United States Supreme Court upheld a similar statute in New Jersey in *Everson v. Board of Education of Ewing Township*, 330 U.S. 1 (1947). Similarly, while the Missouri Supreme Court found a statute that required the use of public funds to purchase textbooks for students and teachers in private non-profit elementary and secondary schools, including parochial institutions, to be unconstitutional in *Paster v. Tussey*, 512 S.W.2d 97 (Mo. 1974), the United States Supreme Court has found no violation under the Federal Constitution. *See, e.g., Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236 (1968).

Trinity argues, however, that the Missouri Supreme Court's long-held "high wall" has begun to crumble in recent years. Trinity primarily relies upon the Missouri Supreme Court's decision in *St. Louis University v. Masonic Temple Association of St. Louis*, 220

8

S.W.3d 721 (Mo. 2007), to support its proposition that "public monies have gone to churches and religious organizations with the blessing of the state." [Doc. #20 at 18]. However, this statement mischaracterizes the Missouri Supreme Court's holding in that case. The City of St. Louis granted St. Louis University public aid through tax increment financing ordinances for the construction of a new arena. *Id.* at 724. The Missouri Supreme Court found these ordinances to be constitutional after first determining that, under Article I, Section 7 and Article IX, Section 8,[1] St. Louis University was not controlled by a religious creed and therefore the public funding was not impermissible. *Id.* at 728. In particular, the Missouri Supreme Court determined that "[a] key question is whether religion so pervades the atmosphere of the university that it is in essence under religious control or directed by a religious denomination." *Id.* at 726. Although the University was affiliated with the Jesuits and contained religious aspirations in its by-laws, an independent board managed and administered it. Additionally, its "mission [was] education, not indoctrination, and its focus [was] on development of students, not on the propagation of the Jesuits' faith." *Id.* at 728. Consequently, the Missouri Supreme Court did not find a constitutional violation because it determined that St. Louis University was, despite its affiliation with the Jesuits, in practice an independent institution.

---

[1] The Court has often interpreted Article I, Section 7 alongside Article IX, Section 8, which provides that "[n]either the general assembly, nor any county, city, town, township, school district or other municipal corporation, shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose, or to help to support or sustain any private or public school, academy, seminary, college, university, or other institution of learning controlled by any religious creed, church or sectarian denomination whatever;…." Mo. Const. art. IX, § 8. Missouri courts often construe these two sections together to represent Missouri's establishment clause. *See, e.g., St. Louis Univ.*, 220 S.W.3d at 725.

9

The Missouri Supreme Court's holding in *St. Louis University* reflects a consistent recognition of the unique circumstances involved in the State's relationship with private institutions of higher education, many of which have historical ties with a particular denomination of religion. Thirty years earlier in *Americans United*, the Missouri Supreme Court upheld a tuition grant aid program to students who attended public or private colleges and universities after finding that the institutions needed to have independent boards and policies of academic freedom. 538 S.W.2d at 720-21. It stressed that student attendance at private colleges and universities "does not have the same religious implications or significance" found in elementary or secondary schools. *Id.* at 721. It distinguished its decision from the prior "parochial school cases," such as *Harfst*, by emphasizing that "institutions of higher education are able to boast of academic freedom, institutional independence, objective instruction, lack of indoctrination, faculty autonomy, mature students, and a diversity of religious background in faculty and students." *Id.* at 722 (internal quotations omitted).

The Missouri Supreme Court's decisions in *Americans United* and *St. Louis University* are not examples of public aid to religious institutions with the "blessing of the state," as characterized by Trinity's counsel. Rather, these cases can be distinguished from Missouri jurisprudence regarding the high wall of separation between church and state in two distinct ways. First, the Missouri Supreme Court in both cases makes clear that the religious institutions receiving aid, indirectly through the students in *Americans United* and through the developer in *St. Louis University*, were not controlled by a church or religious creed. This stands in contrast to the facts in *Harfst*, *McVey*, and *Paster*, in

10

which the institutions receiving aid were parochial or former parochial schools under the control of the church. Second, the schools in *Americans United* and *St. Louis University* were institutions of higher education. Although the Missouri Constitution makes no explicit distinction between institutions of higher education and primary or secondary schools in Article I, Section 7, the Missouri Supreme Court has, on several occasions, considered it to be a relevant factor. In *Americans United*, for example, it emphasized the differences between parochial elementary and secondary schools on the one hand and universities on the other, based on the fact that the latter had greater academic freedom, mature students, and secular curriculum. *See also Menorah Med. Ctr. v. Health & Educ. Facilities Auth.*, 584 S.W.2d 73, 87 (Mo. 1979) (considering recipient universities' status as institutions of higher education, "as opposed to elementary or secondary level," to be a factor in finding no excessive entanglement in a financing program authorized by state law and operated by a non-state entity). This distinction between institutions of higher education and primary or secondary schools emphasizes the Missouri Supreme Court's concern with the degree of control a church, creed, or religious domination may have over the administration, management, and curriculum development at a school. When that degree of control was so great that the school was, in essence, serving as a proxy or branch of the church, the Missouri Supreme Court has consistently held that public aid, direct or indirect, would be impermissible.

Thus, the allegations in Trinity's complaint show that public funding through the Scrap Tire Program would be impermissible under Section 7. First, the Learning Center, which merged with Trinity in 1985, today remains part of and run by the Church. Trinity

11

alleges that the Learning Center is a "ministry" of the Church that directly instructs students in the Church's religious beliefs. Particularly, Trinity notes the "[t]he Church has a sincere religious belief to be associated with the Learning Center and to use it to teach the Gospel to children of its members, as well to bring the Gospel messages to non-members." [Doc. #1 at 4]. Unlike the colleges and universities in *St. Louis University* or *Americans United*, the Church controls the Learning Center. It utilizes religious curriculum in daily activities in its pre-school and daycare by "teaching a Christian world view." *Id.* Its students are children, not mature adults instructed by faculty with diverse religious backgrounds. By all indications, Trinity has pled that its Learning Center is a part of the Church and is used to inculcate its religious beliefs to children in the pre-school and daycare. Missouri courts have consistently held that public aid to such an organization is prohibited under the State constitution.

In conclusion, Section 7 clearly prohibits public money from, directly or indirectly, going to aid a church, sect, or denomination of religion. Trinity's own pleadings demonstrate that funds from Pauley's department in the form of the Scrap Tire Program would aid the Church and its ministry Learning Center within the meaning of Missouri law. As the Missouri Constitution prohibits such aid, the Department's refusal to grant it cannot be considered discrimination under Section 7. To hold otherwise would permit the second half of the section to obviate the first, in that complying with the prohibition of aid to a church would violate the prohibition on discrimination against a church. Thus, Trinity's claims based on the Missouri Constitution must fail.

This conclusion also obviates Trinity's claim during oral argument that discovery is necessary regarding the State's legitimate interest in denying Trinity's grant application. The Court has rejected Trinity's interpretation of "aid" as it is used in Article 7, so discovery about the benefits and burdens of the scrap metal program are not relevant. Trinity's counsel also sought discovery about whether the State consistently complies with Article 7, but Trinity has failed to identify any evidence that might support its claim, nor has it shown that a state could ever forfeit its interest in complying with its own laws.

### B.     Free Exercise

Pauley also argues that Trinity's Complaint fails to state a claim for a violation of the Free Exercise Clause of the First Amendment because Trinity and its members were not prevented from exercising any religious practice, merely because they could not get funding from the State.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. Amend. I. With respect to this clause, the Supreme Court has explained, "[t]he crucial word in the constitutional text is 'prohibit.' For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) (quoting *Sherbert v. Verner*, 374 U.S. 398, 412 (1963) (Douglas, J., concurring)). Put differently, this clause provides "'protection from certain forms of governmental compulsion,'" *United States v. Means*, 858 F.2d 404, 406 (8th Cir. 1988) (quoting *Bowen*

13

*v. Roy*, 476 U.S. 693, 700 (1986)), but generally does not provide a basis for "[d]emands for affirmative governmental assistance," *United States v. Friday*, 525 F.3d 938, 957 (10th Cir. 2008). *See also Sherbert*, 374 U.S. at 412 (Douglas, J., concurring) ("The fact that government cannot exact from me a surrender of one iota of my religious scruples does not, of course, mean that I can demand of government a sum of money, the better to exercise them."). As Trinity's claim is based solely on the denial of an affirmative benefit, Pauley argues that the Complaint fails to state a claim for a violation of the Free Exercise Clause.

In response, Trinity argues that the Free Exercise Clause is implicated in this case because the decision to deny Trinity's grant application targeted Trinity for disparate treatment on the basis of religion. In support, Trinity cites a string of cases, beginning with *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993), which hold that, under the Free Exercise Clause, a court must strictly scrutinize any law that burdens religious practice and is not neutral and generally applicable. Trinity maintains that strict scrutiny applies in this case because the policy of not awarding grants to sectarian institutions is not neutral and generally applicable and that this policy cannot withstand strict scrutiny review. However, as discussed in detail below, Trinity's Free Exercise claim erroneously conflates what a state <u>may</u> do without violating the Establishment Clause of the First Amendment with what a state <u>must</u> do under the Free Exercise Clause.

In each of the cases cited by Trinity to support its Free Exercise claim, the ordinance or regulation at issue directly prohibited or restricted the exercise of a religious

14

practice. *See, e.g., Lukumi*, 508 U.S. at 542, 547 (1993) (invalidating a series of ordinances that prohibited the ritual slaughter of animals, which "had as their object the suppression of religion."); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 167-68 (3d Cir. 2002) (finding that the discriminatory enforcement of an ordinance, which was selectively applied to prohibit the Orthodox Jewish practice of hanging *lechis* while permitting other, comparable secular and non-secular hangings, "violate[d] the neutrality principle of *Lukumi*"); *Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir. 1995) (holding that a series of Army regulations were not neutral where the regulations "uniformly ban[ned] all religious practice"); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1232-34 (11th Cir. 2004) (finding that a zoning ordinance that excluded religious groups from a certain district but not similarly situated secular groups "improperly targeted religious assemblies"). By contrast, the denial of an affirmative benefit from the government "is of a 'wholly different, less intrusive nature than affirmative compulsion or prohibition, by threat of penal sanctions, for conduct that has religious implications.'" *Means*, 858 F.2d at 407 (quoting *Roy*, 476 U.S. at 704); *see also Johnson v. Robison*, 415 U.S. 361, 385-86 (1974) ("The withholding of educational benefits involves only an incidental burden upon appellee's free exercise of religion—if, indeed, any burden exists at all.").

     As a result, the present case is decidedly more analogous to *Locke v. Davey*, 540 U.S. 712, 715 (2004), wherein the Supreme Court upheld the state of Washington's decision to exclude students pursuing degrees in devotional theology from its Promise Scholarship Program. This program provided postsecondary students with state-funded

scholarships for educational expenses, provided that the students met certain requirements. *Id.* at 715. Each year, the funds available for the program were "evenly prorated among the eligible students." *Id.* 716. In accordance with Washington's constitutional prohibition on providing grants to students pursuing degrees "that are 'devotional in nature or designed to induce religious faith,'" eligible students were precluded from using the scholarship to pursue a degree in theology. *Id.* After the plaintiff in *Locke* was denied a Promise Scholarship due to his decision to pursue a devotional degree, the student filed suit, alleging, *inter alia*, a violation of the Free Exercise Clause. *Id.* at 717-18. The district court granted summary judgment in favor of the State and the Court of Appeals for the Ninth Circuit reversed, finding that, under *Lukumi*, strict scrutiny applied because the State had targeted religion for unfavorable treatment. *Id.* at 718.

The Supreme Court reversed, holding that "such an exclusion from an otherwise inclusive aid program does not violate the Free Exercise Clause of the First Amendment." *Id.* at 715. The Court began by reiterating that, while the two Religion Clauses "are frequently in tension," its precedents have "long said that there is room for play in the joints between them," meaning "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Id.* at 718-19 (quotation omitted). In upholding the plaintiff's exclusion from the scholarship program, the Supreme Court considered and rejected the plaintiff's argument that, under *Lukumi*, the scholarship program "is presumptively unconstitutional because it is not facially neutral with respect to religion." *Id.* at 720. The Supreme Court reasoned that accepting

16

this claim "would extend the *Lukumi* line of cases well beyond not only their facts but their reasoning." *Id.* at 720. On this point, the Supreme Court went on to explain:

> In *Lukumi,* the city of Hialeah made it a crime to engage in certain kinds of animal slaughter. We found that the law sought to suppress ritualistic animal sacrifices of the Santeria religion. . . . In the present case, the State's disfavor of religion (if it can be called that) is of a far milder kind. It imposes neither criminal nor civil sanctions on any type of religious service or rite. It does not deny to ministers the right to participate in the political affairs of the community. . . . And it does not require students to choose between their religious beliefs and receiving a government benefit. . . . The State has merely chosen not to fund a distinct category of instruction.

*Id.* at 720-21. Accordingly, because this scholarship program did not "evinc[e] the hostility toward religion which was manifest in *Lukumi*," the Court could not "conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect." *Id.* at 724-25. "Without a presumption of unconstitutionality," the Court held, this "claim must fail." *Id.* at 725.

Trinity argues that *Locke* is distinguishable because the holding in *Locke* was explicitly limited to funding the religious training of clergy, and the *Locke* decision was based, at least in part, on a longstanding aversion to using tax dollars to fund the ministry and the concomitant finding that there are "few areas in which a State's antiestablishment interests come more into play." *Id.* at 722-23. But this does not mean that the reasoning of *Locke* is inapplicable in other contexts. *See Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1254 (10th Cir. 2008) ("[W]e are disinclined to think that *Locke* is confined to its facts. . . . Presumably, there are other forms of state decisions not to fund religious instruction that would pass muster under the Free Exercise Clause beyond the clergy training involved in *Locke*."); *Eulitt ex rel. Eulitt v. Me., Dep't of Educ.*, 386 F.3d 344,

355 (1st Cir. 2004) ("The appellants endeavor to cabin [*Locke*] and restrict its teachings to the context of funding instruction for those training to enter religious ministries. Their attempt is unpersuasive. We find no authority that suggests that the room for play in the joints identified by the [*Locke*] Court, . . . is applicable to certain education funding decisions but not others." (quotation omitted)).

Furthermore, Trinity's attempt to distinguish *Locke* on this basis is particularly unpersuasive here, because this case raises antiestablishment concerns that are at least comparable to those relied on by the Court in *Locke*. In particular, Trinity ultimately seeks the direct payment of government funds to a religious institution. Unlike in *Locke*, where "the link between government funds and religious training [was] broken by the independent and private choice of recipients" and so there was "no doubt" that the state could have provided scholarships to students pursuing devotional degrees without offending the Establishment Clause, *id.* at 719, the grant at issue in this case would be paid directly to a religious preschool and daycare. The Supreme Court has repeatedly and consistently cautioned that "special Establishment Clause dangers" arise "where the government makes direct money payments to sectarian institutions." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 842 (1995); *accord Mitchell v. Helms*, 530 U.S. 793, 818-19 (2000); *see also Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 11 (1947) (examining the historical origin of the First Amendment and concluding that "[t]he imposition of taxes to pay ministers' salaries *and to build and maintain churches and church property* aroused [the colonists'] indignation. It was these feelings which found expression in the First Amendment." (emphasis added)). As a result, Supreme

18

Court precedent draws "a consistent distinction between government programs that provide aid directly to religious schools, . . . and programs of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals." *Zelman v. Simmons-Harris*, 536 U.S. 639, 649 (2002) (citations omitted). While it is well-established that the latter is generally permissible, *id.*, "[i]t is equally well-settled . . . that the State may not grant aid to a religious school, whether cash or inkind, where the effect of the aid is 'that of a direct subsidy to the religious school' from the State." *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481, 487, (1986) (citing, *inter alia, Comm. for Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973)).

In *Nyquist*, for instance, the Supreme Court held that a New York statute that provided for direct money grants to sectarian schools to be used for the maintenance and repair of school facilities violated the Establishment Clause. *Nyquist*, 413 U.S. at 774-80. The Supreme Court based its decision largely on the fact that the statute did not "restrict payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes." *Id.* at 774 ("Nothing in the statute, for instance, bars a qualifying school from paying out of state funds the salaries of employees who maintain the school chapel, or the cost of renovating classrooms in which religion is taught, or the cost of heating and lighting those same facilities."). After a thorough review of its precedent on this issue, the Supreme Court concluded:

> If tax-raised funds may not be granted to institutions of higher learning
> where the possibility exists that those funds will be used to construct a
> facility utilized for sectarian activities 20 years hence, a fortiori they may

19

not be distributed to elementary and secondary sectarian schools for the maintenance and repair of facilities *without any limitations on their use.* If the State may not erect buildings in which religious activities are to take place, it may not maintain such buildings or renovate them when they fall into disrepair.

*Id.* at 413 776-77; *see also Freedom from Religion Found., Inc. v. Bugher*, 249 F.3d 606, 613-14 (7th Cir. 2001) (holding that, under *Nyquist*, a Wisconsin program that provided direct grants to sectarian schools for the purpose of subsidizing telecommunications access violated the Establishment Clause because the money could be used "for connection time to view a religious website"). There is no reason to suspect that this rule is any less applicable where the facility in question belongs to a preschool or daycare.[2]

---

[2] If anything, providing direct aid to a religious preschool is *less* likely to withstand an Establishment Clause challenge. In *Tilton v. Richardson*, 403 U.S. 672, 674-75, 689 (1971), a plurality upheld the provision of government grants to sectarian colleges and universities for the construction of buildings, provided that the buildings were used exclusively for secular purposes. In reaching this conclusion, however, the plurality emphasized that:

> There are generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools. The affirmative if not dominant policy of the instruction in pre-college church schools is to assure future adherents to a particular faith by having control of their total education at an early age. . . . There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination. . . . Furthermore, by their very nature, college and postgraduate courses tend to limit the opportunities for sectarian influence by virtue of their own internal disciplines. Many church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students. . . . Since religious indoctrination is not a substantial purpose or activity of these church-related colleges and universities, there is less likelihood than in primary and secondary schools that religion will permeate the area of secular education. This reduces the risk that government aid will in fact serve to support religious activities.

*Id.* at 685-86, (quotation and citation omitted).

20

Trinity has not claimed that its playground is used exclusively for secular purposes and the allegations in its Complaint suggest that it is not. According to the Complaint:

> The Learning Center is a ministry of the Church and incorporates daily religion and developmentally appropriate activities into a school and optional daycare program. [] Through the Learning Center, the Church teaches a Christian world view to children of members of the Church, as well as children of non-member residents of Boone County and the surrounding area. . . . The Church has a sincere religious belief to be associated with the Learning Center and to use it to teach the Gospel to children of its members, as well to bring the Gospel message to non-members.

[Doc. # 1 at 4]. It is thus clear from the face of the Complaint that religious instruction is a central element of the preschool and daycare offered through the Learning Center, and there is nothing in the Complaint to suggest that this instruction does not extend to the playground.

Thus, using taxpayer-raised funds to refurbish Trinity's playground, no matter how innocuous, raises Establishment Clause concerns even if such use of funds would not violate the Establishment Clause. *See Nyquist*, 413 U.S. at 780 ("In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that direct aid in whatever form is invalid. . . . 'No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.'" (quoting *Everson*, 330 U.S. at 16); *see also Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1098 (8th Cir. 2000) ("[S]ection 4454 does not cause government aid to flow to 'pervasively sectarian institutions,' the funding of which constitutes an improper

21

benefit to religion. . . . A pervasively sectarian institution is one in which religion so pervades its functions that *any* government aid it receives, *even if designated for secular activities*, impermissibly assists religion because the institution is unable to separate the funded secular activities from its religious mission." (emphases added));[3] *Strout v. Albanese*, 178 F.3d 57, 63 (1st Cir. 1999) ("The historic barrier that has existed between church and state throughout the life of the Republic has . . . acted as an insurmountable impediment to the *direct* payments or subsidies by the state to sectarian institutions, particularly in the context of primary and secondary schools.").

That said, the question of whether awarding a scrap tire grant directly to Trinity would violate the Establishment Clause is not at issue in this case, and so it is neither necessary nor appropriate to resolve this question here. Nonetheless, the existence of a longstanding and legitimate antiestablishment interest makes this case nearly indistinguishable from *Locke*. As a result, even assuming that providing a tire scrap grant to Trinity would not violate the Establishment Clause, this Court cannot conclude that the exclusion of a religious preschool from this aid program is constitutionally suspect under the Free Exercise Clause in light of the longstanding and substantial concerns about

---

[3] Though heavily criticized by the plurality opinion in *Mitchell v. Helms*, 530 U.S. 793 (2000), the pervasively sectarian test remains the test that this Court, under both Supreme Court and Eighth Circuit precedent, is bound to apply. *See Min De Parle*, 212 F.3d at 1098; *Steele v. Indus. Dev. Bd. Of Metro. Gov't Nashville*, 301 F.3d 401, 408 (6th Cir. 2002) (concluding that, although "[t]he vitality of the pervasively sectarian test is questionable in light of" *Mitchell*, because "*Mitchell* is a plurality opinion . . . the district court, and this Court, are still bound by pre-*Mitchell* law with regard to the pervasively sectarian doctrine. . . . Further, the Supreme Court has specifically stated that the lower courts are to treat its prior cases as controlling until the Supreme Court itself specifically overrules them. . . . It is for the Supreme Court, not this Court, to jettison the pervasively sectarian test, which it has not done.").

direct payment of public funds to sectarian schools. *Cf. Locke*, 540 U.S. at 725 (determining that "there is no doubt that the State could, consistent with the Federal Constitution, permit Promise Scholars to pursue a degree in devotional theology," but nonetheless holding that "[g]iven the historic and substantial state interest at issue, we [] cannot conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect."); *Eulitt ex rel. Eulitt*, 386 F.3d at 355 (concluding that the *Locke* Court "recognized that state entities, . . . may act upon their legitimate concerns about excessive entanglement with religion, even though the Establishment Clause may not require them to do so.").

As in *Locke*, the exclusion from the tire scrap grant program places a relatively minor burden on Trinity. *Cf. Locke*, 540 U.S. at 720 ("In the present case, the State's disfavor of religion (if it can be called that) is of a far milder kind. . . . [T]he exclusion of such funding places a relatively minor burden on Promise Scholars."). In fact, unlike the scholarships in *Locke*, which each applicant who met the basic requirements was guaranteed to receive, *id.* at 716, the tire scrap grants are competitively awarded because of the limited funds available for the program. [Doc. # 1 at 6]. According to the Complaint, only fourteen of the forty-four applicants received tire scrap grants in the year Trinity applied. [Doc. # 1 at 6]. As a result, Trinity is no worse off than any of the thirty secular institutions that applied for grants and did not receive them.

Furthermore, it is not unreasonable that the state of Missouri, in determining how to apportion the limited funds available for this program, would choose to exclude a religious preschool and daycare based on antiestablishment concerns arising under both

23

the First Amendment[4] and its own, significantly more restrictive Constitution. Nothing in the Complaint suggests that the decision to deny Trinity's grant application was motivated by hostility toward religion as opposed to a legitimate interest in avoiding government entanglement with religion. Furthermore, "it would be illogical to impose upon government entities a presumption of hostility [toward religion] whenever they take into account plausible entanglement concerns in making decisions in areas that fall within the figurative space between the Religion Clauses." *Eulitt ex rel. Eulitt*, 386 F.3d at 355.

Finally, while there is comparatively little authority directly addressing this issue, lower courts have consistently rejected Free Exercise claims in analogous circumstances. In *Strout*, for instance, the First Circuit upheld a statute that offered grants directly to private educational institutions, provided that they were "non-sectarian," to subsidize the education of students residing in communities without public education facilities. *Strout*, 178 F.3d at 59. In upholding the prohibition on providing subsidies directly to religious schools attended by students who otherwise qualified for the grants, the *Strout* court considered and rejected the claim that this restriction violated "the Free Exercise Clause . . . because it excludes funding of sectarian education solely on the basis of religion." *Id.* at 65. The *Strout* court reasoned that the Free Exercise Clause was "not implicated" in this context because the decision not to subsidize sectarian schools in no way prevented students from attending religious schools; "[a]ll it means is that the cost of religious

---

[4] While the *Locke* Court characterized the State of Washington's interest in not funding the religious instruction of future clergy as "substantial," *Locke*, 540 U.S. at 725, the Court has also suggested "that the interest of the State in avoiding an Establishment Clause violation 'may be [a] compelling' one." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (quoting *Widmar v. Vincent,* 454 U.S. 263, 271 (1981)).

education must be borne by the parents and not the state." *Id.* The *Strout* court also concluded that the Supreme Court's decision in *Lukumi* was "inapposite," because there had not been any suggestion that the restriction on subsidies to sectarian schools was motivated by "a substantial animus" against religion. *Id.* Following the Supreme Court's decision in *Locke*, the First Circuit had cause to revisit its decision in *Strout* and concluded that "recent Supreme Court jurisprudence reinforces rather than undermines *Strout's* conclusion that [the challenged statute] perpetrates no free exercise violation." *Eulitt ex rel. Eulitt*, 386 F.3d at 356.

Similarly, in *Luetkemeyer v. Kaufmann*, 364 F. Supp. 376, 378 (W.D. Mo. 1973), *aff'd*, 419 U.S. 888 (1974), a three judge panel, with one judge dissenting, rejected the claim that the state of Missouri's decision to provide bus transportation for students attending public but not parochial schools violated the Free Exercise Clause. The plaintiffs in *Luetkemeyer* argued, as Trinity does here, that the denial of this benefit "force[d] them to forego the exercise of their right to freely exercise their religion in order to secure a public benefit, and penalize[d] the free exercise of religion in violation of the First Amendment." *Id.* at 377-78. In rejecting this contention, the court first reasoned that "[p]rinciples which state what a State *may* do may not properly be read as a command to what a State *must* do." *Id.* at 381; *accord McCarthy v. Hornbeck*, 590 F. Supp. 936, 943 (D. Md. 1984). For support, the *Luetkemeyer* court relied on the Supreme Court's decision in *Norwood v. Harrison*, 413 U.S. 455, 462 (1973), wherein "[t]he Appellees intimate[d] that the State must provide assistance to private schools equivalent to that which it provides to public schools." In response, the *Norwood* Court ruled:

Clearly, the State need not. Even as to church-sponsored schools, whose policies are nondiscriminatory, any absolute right to equal aid was negated, at least by implication, in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Religion Clauses of the First Amendment strictly confine state aid to sectarian education. Even assuming, therefore, that the Equal Protection Clause might require state aid to be granted to private nonsectarian schools in some circumstances—health care or textbooks, for example—a State could rationally conclude as a matter of legislative policy that constitutional neutrality as to sectarian schools might best be achieved by withholding all state assistance.

*Norwood*, 413 U.S. at 462. Based on this reasoning and Missouri's "long history of maintaining a very high wall between church and state," the *Luetkemeyer* court concluded "that the Constitution of the United States does not compel the state of Missouri to provide equal transportation services to private and church-sponsored schools and that it may, as it has, elect to provide such service only for its public schools." *Luetkemeyer*, 364 F. Supp. at 387.

Two years earlier, in *Brusca v. Missouri ex rel. State Board of Education*, 332 F. Supp. 275 (E.D. Mo. 1971), *aff'd sub nom.*, *Brusca v. State Board of Education*, 405 U.S. 1050 (1972), a three judge panel for the Eastern District of Missouri unanimously reached the same conclusion. The plaintiffs in *Brusca* claimed that Missouri's constitutional prohibition on the use of public funds to aid sectarian schools impaired their free exercise rights and denied them equal protection under the law. *Id.* at 276. In concluding that the First Amendment did not require equal allocation of public assistance to secular and religious schools, the *Brusca* court first remarked, "The issue presented . . . is not so much what Missouri *may* do but what it *must* do in aid of religious education." *Id.* From here, the court reasoned:

26

> [A] parent's right to choose a religious private school for his children may
> not be equated with a right to insist that the state is compelled to finance his
> child's non-public school education in whole or in part in order that he may
> obtain a religious education. . . . [T]o the extent the Religion Clauses of the
> First Amendment do not prohibit such financial aid, they do not require that
> it be given by the State. . . . We find nothing arbitrary or unreasonable in
> the determination of the State to deny its funds to sectarian schools or for
> religious instruction.

*Id.* at 277, 279. In an analogous case, on appeal from the Central District of California's

decision entering judgment for the state of California, the Ninth Circuit "deferred

decision . . . awaiting the outcome of the appeal in *Brusca*." *Jackson v. California*, 460

F.2d 282, 283 (9th Cir. 1972) (per curiam). After the Supreme Court affirmed, the Ninth

Circuit, "[o]n authority of *Brusca*," affirmed the district court's decision. *Id.*

 Other courts, often citing *Brusca* and *Luetkemeyer*, have consistently reached the

same conclusion. For instance, in rejecting the claim that not providing tax credits for

educational expenses to parents of students attending religious schools, the Southern

District of Ohio reasoned:

> While the state may grant secular, neutral, non-ideological aid to sectarian
> school students when such aid is granted in common to all students, . . . no
> *right* to such aid under the Free Exercise Clause has been established in our
> constitutional matrix. The broad construction of the Free Exercise Clause
> urged upon us by the state would for all practical purposes, render
> meaningless the thrust and import of the Establishment Clause. . . . [The
> Free Exercise Clause] has never been interpreted as placing an affirmative
> duty upon the state to appropriate money so that religious beliefs might be
> more effectively exercised or the continuing vitality of religious institutions
> ensured. . . . The adoption of such a view would mark a profound and
> radical departure from the philosophy of separation of Church and State
> which has characterized this country from its very inception.

*Kosydar v. Wolman*, 353 F. Supp. 744, 764-65 (S.D. Ohio 1972), *aff'd sub nom., Grit v.*

*Wolman*, 413 U.S. 901 (1973); *accord Valencia v. Blue Hen Conference*, 476 F. Supp.

27

809, 824 (D. Del. 1979) ("[W]hile the State May, without violating the Establishment

Clause, provide some secular benefits which incidentally relieve the burdens assumed by

parents who choose to send their children to parochial schools, it is not required to do so

by the Free Exercise Clause."), *aff'd*, 615 F.2d 1355 (3d Cir. 1980); *see also McCarthy*,

590 F. Supp. at 945-46 ("The Supreme Court has consistently held that a statute does not

impinge on a constitutional right merely because it does not subsidize that right. . . .

Subsidization by the state of Maryland of plaintiffs' constitutional right to send their

children to church-related schools is not mandated by the First Amendment.").  Against

this authority, Trinity has not presented a single case that supports the proposition that the

State, in establishing a program that offers grants to public and private institutions

engaged in early childhood care and education, is constitutionally required to include

religious institutions in the program if their inclusion would not violate the Establishment

Clause.

     To the extent that Trinity suggests that this case is analogous to *Sherbert*, wherein

the Supreme Court held that a State may not apply the provisions governing eligibility for

public welfare benefits "so as to constrain a worker to abandon her religious convictions

respecting the day of rest," *Sherbert*, 374 U.S. at 410, the *Luetkemeyer* court aptly

explained why the narrow holding in *Sherbert* is inapplicable in this context:

> *Sherbert* involved a request for dispensation from a general regulatory law;
> not a request or demand for a public service.  While the exemption or
> dispensation would clearly result in some aid to a particular individual, it
> did not involve the expenditure of state funds which would, in fact,
> indirectly aid a religious institution.  The Court simply did not have the
> latter question before it.  Justice Douglas appropriately pointed out in his

concurring opinion, that 'this case does not involve the problems of direct
or indirect state assistance to a religious organization.'"

*Luetkemeyer*, 364 F. Supp. at 385 (citation omitted); *accord Brusca*, 332 F. Supp. at 279

("Nothing in *Sherbert* . . . , relied on by plaintiffs, suggests a different result or implies

that a state must finance or subsidize religious schools.  That case did not involve any

issue of direct or indirect state assistance to a religious organization."); *see also Sherbert*,

374 U.S. at 409 ("[T]he extension of unemployment benefits to Sabbatarians in common

with Sunday worshippers reflects nothing more than the governmental obligation of

neutrality in the face of religious differences, and does not represent that involvement of

religious with secular institutions which it is the object of the Establishment Clause to

forestall.").  *Sherbert* has never been extended to require that religious institutions be

given equal access to government funds and, absent some authority, the Court cannot

adopt such an unprecedented rule here.

In conclusion, even assuming that providing a tire scrap grant to Trinity would not

violate the Establishment Clause (an issue not before the Court), there is no basis for

concluding that the decision to exclude religious institutions from this program did

violate the Free Exercise Clause.  Accordingly, Trinity's Free Exercise claim is

dismissed.

### C.    Equal Protection

Having concluded that the Complaint fails to allege a violation of the Free

Exercise Clause, Trinity's Equal Protection claim must also be dismissed.  The *Locke*

29

Court rejected the plaintiff's Equal Protection claim in a footnote, reasoning that "[b]ecause we hold, . . . that the program is not a violation of the Free Exercise Clause, . . . we apply rational-basis scrutiny to his equal protection claims." *Locke*, 540 U.S. at 720 n.3; *accord Johnson*, 415 U.S. at 375 n.14 (1974). Applying rational-basis review, the *Locke* Court easily found that Washington's scholarship program survived this level of scrutiny for the same reasons that it did not violate the Free Exercise Clause. *Locke*, 540 U.S. at 720 n.3.

From the allegations in the Complaint, it is clear that the decision to exclude religious organizations from participation in the Tire Scrap Program withstands rational-basis review. According to Trinity, the letter that explained the decision to deny Trinity's grant application stated:

> [A]fter further review of applicable constitutional limitations, the department is unable to provide this financial assistance directly to the church as contemplated by the grant application. Please note that Article I, Section 7 of the Missouri Constitution specifically provides that 'no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion.'

[Doc. # 1 at 6]. Thus, as in *Locke*, Trinity's exclusion from the aid program in this case was based on the Missouri Constitution's heightened separation of church and state. *Cf. id.* at 716. Whether characterized as "substantial," *id.* at 725, or "compelling," *Luetkemeyer*, 364 F. Supp. at 386, the antiestablishment concerns that motivated this decision, based on Trinity's own allegations, at least bears "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993). This holds true regardless of whether providing

30

Trinity with a grant would actually violate the Establishment Clause. *See Locke*, 540 U.S. at 719, 725 (finding that Washington had a "substantial" antiestablishment interest, despite the fact that there was "no doubt" that the State could have provided the scholarship in question without violating the Establishment Clause). Accordingly, Trinity's Equal Protection claim must be dismissed.

      **D.**    **Establishment**

      Trinity's Establishment Clause claim is premised on the theory that the decision not to award Trinity a grant evinced hostility toward religion, in violation of the neutrality toward religion mandated by the Establishment Clause. None of the cases cited by Trinity, however, supports the proposition that the Establishment Clause entitles Trinity to relief in this case.

      Specifically, in support of its theory, Trinity relies on two Supreme Court cases concerning student access to school resources and facilities that were ultimately decided on free speech or statutory grounds. *See Rosenberger*, 515 U.S. at 822-836 (holding that the University of Virginia's exclusion of religiously motivated student publications from a policy that paid the printing costs of a variety of student publications constituted viewpoint discrimination in violation of the students' right of free speech); *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. at 235-47 (holding that a public high school's refusal to officially recognize a Christian club violated the Equal Access Act, 20 U.S.C. §§ 4071-4074 and explicitly declining to "decide—and therefore express[ing] no opinion on—whether the First Amendment requires the same result."). In each of these cases, the Establishment Clause was only considered from the perspective of whether it

31

prohibited the school from providing the funds or access that the students sought. *See Rosenberger*, 515 U.S. at 837-38; *Mergens*, 496 U.S. at 247-48. Neither of these cases can plausibly be read as requiring the State to provide a religious institution with a publicly funded subsidy by virtue of the neutrality toward religion generally required under the Establishment Clause.

Furthermore, in the only case of which the Court is aware that has directly addressed this issue, the First Circuit considered and rejected the same theory advanced by Trinity. *See Strout*, 178 F.3d at 60 ("[P]laintiff-appellants argue that the statute, . . . violates the Establishment Clause because, rather than treating religion neutrally, it demonstrates a hostility toward religion . . . ."). In concluding that the plaintiffs' reliance on *Rosenberger* was "misplaced," the *Strout* court found "[m]ost telling . . . the majority's analysis of the issues presented by that appeal." *Id.* at 63. Specifically, the *Rosenberger* Court had explained,

> The Court of Appeals (and the dissent) are correct to extract from our decisions the principle that we have recognized special Establishment Clause dangers where the government makes direct money payments to sectarian institutions, . . . . The error is not in identifying the principle, but in believing that it controls this case. . . . [T]he Court of Appeals decided a case that was, in essence, not before it, and the dissent would have us do the same. *We do not confront a case where, even under a neutral program that includes nonsectarian recipients, the government is making direct money payments to an institution or group that is engaged in religious activity.* . . . [T]he undisputed fact [is] that no public funds flow directly to WAP's coffers.

*Rosenberger*, 515 U.S. at 842 (citations omitted) (emphasis added). Thus, the *Rosenberger* Court's conclusion that it does not violate the Establishment Clause to provide religious and secular student groups with "access to [] facilities on a religion-

32

neutral basis," *id.*, can in no way be interpreted as imposing an affirmative obligation to provide direct subsidies to religious institutions. *Mergens* is distinguishable for the same reason.

As the *Strout* court persuasively reasoned, "In lauding neutrality as the keystone of Establishment Clause jurisprudence, plaintiff-appellants forget that neutrality is but one 'hallmark of the Establishment Clause.' *Rosenberger* neither trumpets the supremacy of the neutrality principle nor signals the demise of the funding prohibition in Establishment Clause jurisprudence." *Strout*, 178 F.3d at 63 (quoting *Rosenberger*, 515 U.S. at 846 (O'Connor, J., concurring)). The Strout court went on to conclude:

> [W]e are at a loss to understand why plaintiff-appellants believe that the Establishment Clause gives them a basis for recovery. The Establishment Clause forbids the making of a law respecting the establishment of any religion. There is *no* relevant precedent for using its negative prohibition as a basis for extending the right of a religiously affiliated group to secure state subsidies.

*Id.* at 64. Likewise, in this case, Trinity has not cited, and the Court's independent research has not revealed, a case construing the Establishment Clause in the manner urged by Trinity. Accordingly, there is no basis for concluding that Trinity is entitled to relief under the Establishment Clause and this claim must be dismissed.

## E.     Free Speech

Neither party ever substantively addressed Trinity's claim that the denial of its grant application violated its right to free speech under the First Amendment. In rejecting the plaintiff's free speech claim in *Locke*, the Court reasoned:

> [T]he Promise Scholarship Program is not a forum for speech. The purpose of the Promise Scholarship Program is to assist students from low- and

33

middle-income families with the cost of postsecondary education, not to
encourage a diversity of views from private speakers. . . . Our cases dealing
with speech forums are simply inapplicable.

*Locke*, 540 U.S. at 720 n.3; *accord Eulitt ex rel. Eulitt*, 386 F.3d at 356-57 ("The statute

at issue here does not implicate the appellants' speech rights at all. As the Supreme

Court made clear in *Davey,* state programs to fund general tuition costs are not fora for

speech. . . . The Maine education plan deals with the provision of secular secondary

educational instruction to its residents; it does not commit to providing any open forum to

encourage diverse views from private speakers. Consequently, cases dealing with speech

fora . . . are not relevant.").

Trinity presents no argument or authority that suggests a different result is

warranted where the government program in question is designed to encourage and assist

the use of scrap tires to refurbish playgrounds. There is simply no basis for concluding

that the Tire Scrap Program is designed to provide an open forum encouraging diverse

views from private speakers. Accordingly, for the reasons set forth in *Locke* and *Eulitt*,

the Complaint fails to state a claim for a violation of Trinity's right to free speech under

the First Amendment and this claim must be dismissed.

## III.    Conclusion

For the foregoing reasons, Defendant Pauley's motion to dismiss, [Doc. # 9], is

GRANTED and this case DISMISSED, with prejudice.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: September 26, 2013
Jefferson City, Missouri