1

2                    IN THE UNITED STATES DISTRICT COURT FOR THE
                         WESTERN DISTRICT OF MISSOURI
3                             CENTRAL DIVISION

4

TRINITY LUTHERAN CHURCH OF      ) Case No. 13-04022-CV-C-NKL
5   COLUMBIA, INC.,              ) Jefferson City, Missouri
                                 ) September 19, 2013
6          Plaintiff,            )
                                 )
7   vs.                          )
                                 )
8   SARA PARKER PAULEY,          )
                                 )
9          Defendant.            )
    _____)

10
                        TRANSCRIPT OF ORAL ARGUMENT
11            BEFORE THE HONORABLE NANETTE K. LAUGHREY
                     UNITED STATES DISTRICT JUDGE
12

    APPEARANCES:
13
    For the Plaintiff:          Joel L. Oster, Esq.
14                              Kevin Theriot, Esq.
                                Erik Stanley, Esq.
15                              15192 Rosewood St.
                                Leawood, KS  66224
16                              (913) 685-8000

17  For the Defendant:          Donald A. Willoh, Jr., Esq.
                                Missouri Att. General's Office
18                              P.O. Box 899
                                Jefferson City, MO  65102
19                              (573) 751-3321

20  Court Audio Operator:       Ms. Tania Lock

21  Transcribed by:             Rapid Transcript
                                Lissa C. Whittaker
22                              1001 West 65th Street
                                Kansas City, MO  64113
23                              (816) 914-3613

24

    Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.

1               (Court in Session at 10:59 a.m.)

2         THE COURT:  Good morning everyone.

3         ALL ATTORNEYS:  Good morning, Your Honor.

4         THE COURT:  This is the matter of *Trinity Lutheran vs.*

5 *Sara Parker Pauley*, Case No. 13-4022.  Who's here today to

6 represent the plaintiff?

7         MR. OSTER:  Joel Oster with the Alliance Defending

8 Freedom defending the plaintiff.

9         THE COURT:  All right.  And you have some folks with

10 you, if you'd introduce them.

11         MR. THERIOT:  Kevin Theriot also representing the

12 plaintiff.

13         MR. STANLEY:  And Erik Stanley also for the plaintiff.

14         THE COURT:  All right.  Welcome and I appreciate you

15 making the trip.  I know it's not easy, but it is always

16 something I look forward to, to have lawyers actually in the

17 courtroom rather than just on paper, so.

18         MR. OSTER:  And we have Phil Glenn, from our client, is

19 sitting in the back watching as well.

20         THE COURT:  All right.  Thank you.  Welcome as well.

21         MR. WILLOH:  Good morning, Your Honor.

22         THE COURT:  And for the defendant.

23         MR. WILLOH:  My name is Don Willoh.  I'm here for the

24 State of Missouri.

25         THE COURT:  All right.  Thank you very much.  And the

purpose of this is to have oral argument on the Defendant's

Motion to Dismiss. So, since it is your motion, you may proceed.

MR. WILLOH: Thank you, Your Honor.

THE COURT: Have we given you time limits?

MR. WILLOH: No, Your Honor.

THE COURT: Okay. Well, we'll see how it goes.

MR. WILLOH: Mr. Oster told me he was going to take

about three hours.

THE COURT: Okay.

MR. WILLOH: Just kidding. May it please the Court?

THE COURT: Yes.

MR. WILLOH: Your Honor, thank you for the opportunity

to be here today. The First Amendment provides that Congress

shall make no law respecting the establishment of religion or

prohibiting the free exercise thereof or abridging the freedom of

speech. The Missouri Department of Natural Resources has not

violated the First Amendment. The church is welcome to

participate at it sees fit in the political and social discourse.

Its congregants are welcome to practice their faith without

restraint. Neither the church nor its congregants have been

subjected to any civil --

THE COURT: Slow down, because if you read, I cannot

process the information.

MR. WILLOH: Thank you, Your Honor.

THE COURT: Thank you.

1     MR. WILLOH:  Neither the church nor its congregants have

2 been subjected to any civil or criminal sanctions.  The Missouri

3 Department of Natural Resources has not discriminated against the

4 church in favor of other churches.  It has made no intrusive

5 investigation into the church's affairs, such as was the case in

6 the *Colorado Christian University* case provided by the plaintiffs

7 recently.  Rather, this is a case like *Locke* and *Luetkemeyer*

8 where the State of Missouri's Constitution operates between the

9 joints of the Free Exercise Clause and the Establishment Clause.

10 As the court *Locke* noted --

11     THE COURT:  Does the Missouri Constitution prohibit you

12 giving them money or the product?

13     MR. WILLOH:  Yes.

14     THE COURT:  Okay.  In what way?  Well, there's two

15 clauses.  One says you can't discriminate against us.

16     MR. WILLOH:  And --

17     THE COURT:  Aren't you discriminating against them

18 because they're religious institutions?

19     MR. WILLOH:  No, Your Honor.  We can't give them the

20 money, because the Missouri Constitution, the first clause of

21 Section 7 says we can't.  The second --

22     THE COURT:  But the second clause says you can't

23 discriminate them.  How do you reconcile those two?

24     MR. WILLOH:  You can't discriminate or favor one

25 religion or one church over an another.  That's the reading of

1  the second clause.

2       THE COURT: Okay.

3       MR. WILLOH: As the court noted in *Locke* -- (clearing
4  throat) -- sorry. As the court noted in *Locke*, many states wrote
5  their constitution to formally prohibit the use of tax funds to
6  support the ministry. That's from page 723 on *Locke*. Missouri
7  is merely one of those states that prohibits the use of public
8  funds to a religion. Justice Rehnquist wrote, "This is a
9  scarcely novel idea and we can think of few areas in which a
10  state's anti-establishment interests come more into play." In
11  the church's supplemental authority, *CCU vs. Weaver*, the Tenth
12  Circuit was disturbed by Colorado's necessarily and explicit
13  discrimination among religious institutions.

14       THE COURT: What were the facts in *Weaver*?

15       MR. WILLOH: The facts in *Weaver* were -- it's a
16  scholarship money case, whether scholarship money could be used
17  by students who attended religious institutions. As part of the
18  scholarship evaluation process, the State of Colorado would
19  regularly, as I understand the case, for lack of a better word,
20  investigate the institution to determine how pervasively secular,
21  in the context of that case, meaning religious the institution
22  was; the more pervasively secular, the less likely that it was
23  that scholarships would be given to that institution. In this
24  case, the Missouri DNR does not do that. The DNR does not choose
25  winners and losers for the grant money. It simply follows the

1  Missouri State Constitution which provides that we cannot give

2  public money to religious institutions, but we will not choose

3  between them.

4      THE COURT:  What's the difference between *Weaver* and

5  this case?  Is it just that Missouri didn't investigate to see

6  the extent to which this product would aid religion?  Or is there

7  something different?

8      MR. WILLOH:  There are two reasons.  That is one of

9  them.  The second reason is that the Missouri Constitution does

10  say you can't give public money to aid religion.  That's the

11  quite simple difference.

12      THE COURT:  Okay.

13      MR. WILLOH:  I don't have much more to add.  I thought

14  you might have some questions.  As the court said in *Luetkemeyer*,

15  I'm going to quote this, "The principles which state what a state

16  may do may not properly be read as a command to do what a state

17  must do."  This applies here.  The Missouri Constitution

18  prohibits DNR from awarding this grant money.  If the framers of

19  the Missouri Constitution had said in their -- in its

20  constitution, scrap tire money can be given to churches, that

21  would have been permissible under the First Amendment.  However,

22  what the Missouri Constitution --

23      THE COURT:  So, you concede that it would not violate

24  the First Amendment if Missouri chose to give this to a religious

25  institution?

1          MR. WILLOH:  I believe that's correct.

2          THE COURT:  So, your sole basis for arguing that it is a

3  violation -- it is not a violation of the First Amendment is the

4  fact that you have a state constitution that prohibits it.

5          MR. WILLOH:  I think I follow your question.  I think

6  the answer is yes.  The reason we are here is because the

7  Missouri Constitution prohibits this grant money going to Mr.

8  Oster's client.

9          THE COURT:  Okay.  All right.  Do you wish to reserve

10  any time for rebuttal?

11          MR. WILLOH:  Certainly, I would.  Five minutes.

12          THE COURT:  Five minutes.  Okay.

13          MR. WILLOH:   Thank you, Your Honor.

14          THE COURT:  Tell me what this case is about.

15          MR. OSTER:  May it please the Court?  Well, first of

16  all, we are here on a Motion to Dismiss.  And that is important,

17  because the issue is not whether we can prove our claims, the

18  issue is whether we have pled our claims in this case.  And

19  defendants --

20          THE COURT:  But are there any factual disputes in this

21  case?

22          MR. OSTER:  Well, we're not even to that point.  We've

23  done discovery and we do not believe there are going to be --

24          THE COURT:  Well, I don't mean -- just on the face of

25  the complaint, is anybody contending that you have not pled the

1  facts correctly?

2          MR. OSTER:  No.  I don't think anyone is contending we

3  have -- the facts aren't accurate.  And, in fact, counsel and I

4  have been working together.  We think we're going to be able to

5  present this as stipulated facts.  It's just that this is a

6  Motion to Dismiss.  And so the issue is not whether -- and we're

7  going to get to later on to what is the state's interest, what

8  are the interests of our client, what is the state's interest in

9  applying its Blaine Amendment against the scrap tire program.

10 And all those are factual issues that --

11         THE COURT:  You just referred to the Blaine Amendment.

12 Tell me what you mean by the Blaine Amendment.

13         MR. OSTER:  Article I, Section 7 of the Missouri

14 Constitution is what -- I'll try to refer to it as Article I,

15 Section 7.  If I use the shorthand of Blaine Amendment, I'm

16 referencing that Article I, Section 7 of the Missouri

17 Constitution.

18         THE COURT:  Okay.

19         MR. OSTER:  So, first of all, I just want to point out

20 that we are here on the Motion to Dismiss standard which is

21 highly deferential.  It's have we pled a case and then we are

22 entitled to try to prove our case through discovery and then at

23 the summary judgment stage.  We do have several constitutional

24 claims in this case, but the Court doesn't have to get to the

25 complex constitutional issues as this case can be decided on a

1  narrower issue of state law, because allowing the daycare to

2  participate in the scrap tire program does not violate Article I,

3  Section 7 of the Missouri Constitution, because it is not "in aid

4  of." Now that phrase, "in aid of," has been defined by the --

5          THE COURT: So, forget about the First Amendment, just

6  it's not a violation of state law --

7          MR. OSTER: Correct.

8          THE COURT: -- to give you the products?

9          MR. OSTER: Correct. The Missouri Supreme Court in

10 *Americans United v. Rogers* provided some clarification of what it

11 means when money is "in aid of." And they said it does not

12 include *quid pro quo* transactions. So, if a matter, the

13 transaction is *quid pro quo*, it is not given in preference of the

14 church. And we would maintain that not allowing them to contract

15 with the state would be discrimination against the church.

16         THE COURT: Tell me again the cases you just cited.

17         MR. OSTER: *Americans United v. Rogers*.

18         THE COURT: Okay. These are the Missouri Supreme Court

19 cases.

20         MR. OSTER: Sitting *en banc*, right.

21         THE COURT: Right.

22         MR. OSTER: They defined -- they provided clarification

23 for what the phrase "in aid of" meant and said it does not

24 include *quid pro quo* transactions. In fact, in that case it

25 dealt with tuition scholarships that would -- what would happen

1  is the state would give money in scholarships to a student. They

2  would mail it to the college. And some of these would be

3  religious colleges. And the student would get that check, turn

4  it over to the school. And so the issue is --

5          THE COURT: How is this case different though from the

6  facts there?

7          MR. OSTER: We don't believe it is different. We

8  believe that this --

9          THE COURT: So, they're giving aid to the students who

10 go to the daycare and then the -- they can -- the students can

11 choose which daycare they go to?

12         MR. OSTER: We think this is even --

13         THE COURT: Or is this direct aid to the daycare?

14         MR. OSTER: Well, no. We don't believe this is direct

15 aid to the daycare or indirect aid. We think our case is --

16         THE COURT: Direct payment. Let's say that.

17         MR. OSTER: Right. This isn't even that, we don't

18 believe, because this is a much easier case than what we saw in

19 *Americans United v. Rogers*, because in that case it was indirect

20 funding. And, of course, this is a *quid pro quo* transaction,

21 because when the money is given to the school, the school then

22 has obligations to teach the kids, the students. And so it's a

23 *quid pro quo* transaction. Here, when the State of Missouri

24 contracts with these daycares and these recipients of this

25 program, what the State of Missouri receives as promotional

advertising for a scrap program through the media, these are all part of the contract. Promotion of its program to other organizations, so the daycare has to promote it to other organizations. Missouri would receive reduced landfills, because these scrap tires are not going to go to the landfills. They're going to be going to these playgrounds. And then also reduce pollution, which is the whole point of the program in the first place. In addition, now those are all the benefits that the State of Missouri receives under this arrangement.

THE COURT: Does your client receive any benefits?

MR. OSTER: They would receive benefits of the scrap tire program as well. It would be -- it's a safer material to put on its playground. But our client also receives a lot of obligations -- or incurs a lot of obligations. They must advertise the scrap program through the media. They much teach the students the benefits of recycling. They must promote the scrap tire program to other organizations. Our client agreed to purchase an additional $10,580 worth of scrap tire if they were -- if the program application was approved. They must pay to install the scrap tires. They must store the scrap tires on their property, reducing Missouri's landfills. And they must also -- then they agree to store the scrap tires on the property. So, the department receives several benefits from this program. This is a *quid pro quo* transaction.

THE COURT: Do they receive any benefit, any net

1  benefit?  Or are they just doing a charitable act for the

2  community?

3       MR. OSTER:  Well, the department receives the benefit of

4  reduced pollution.

5       THE COURT:  No, I understand that.  I'm talking about

6  your client.

7       MR. OSTER:  And our --

8       THE COURT:  I think you're arguing that your client

9  doesn't really get any aid.  And the reason it doesn't get any

10  aid is it has all of these burdens that come along with the

11  grant.

12       MR. OSTER:  Well, I don't -- I guess --

13       THE COURT:  So, is there any benefit --

14       MR. OSTER:  Oh, yeah.  There is a --

15       THE COURT:  -- separate from the burdens that they have

16  that make it worthwhile to them to, in fact, get these products?

17  Or is this, in fact, a net loss for them that they're just doing

18  something good for the community?

19       MR. OSTER:  Well, I think they are doing something good

20  for the community and I think this is a *quid pro quo* transaction,

21  so.

22       THE COURT:  Is it a net loss?

23       MR. OSTER:  I don't think at this point in time we can

24  say it's a net loss or a net gain.  One of the things that

25  discovery would let us know is the benefits and the obligations

to both sides.  I think clearly here the daycare wants to be able

to store all of these and promote these scrap tires.  And it is

part of a *quid pro quo* transaction, just like if they were to buy

a property.  If they were to buy property from the state, they

would receive the property, sure, but they also paid a price for

the property.  Just like in *Americans United v. Rogers* where the

students would receive an education, true, but they also -- the

school has to provide the education.  So, there's constant

benefits on both sides and that's why it's a *quid pro quo*

transaction.  And in those situations the Missouri Supreme Court

has said preference is not given -- this is not a situation where

preferential aid is given to the organization.

            THE COURT:  Okay.  So, which case does the Missouri --

            MR. OSTER:  *Americans United v. Rogers*.

            THE COURT:  Okay.

            MR. OSTER:  And we also cited --

            THE COURT:  Was that factually the same, *Americans

United v. Rogers*?

            MR. OSTER:  It's very close.  And I think the facts in

*Americans United v. Rogers* are -- even show -- our facts are even

better than in that case, because in that case they actually

dealt with education, teaching students, money going to a

religious college for that purpose.  Here, what we're talking

about are scrap tires.

            THE COURT:  It was the state giving it directly to the

1  colleges?

2          MR. OSTER:  They gave them money to -- they mailed it --
3  the case outlines how all the transactions happened.  The check
4  was actually mailed to the school who then -- but it was in the
5  name of the student.  The student then signed the check over and
6  gave it to the school and so the school received it.  So, whether
7  you want to call that direct air or indirect aid, it clearly is
8  aid given to the school.  And the court said that even in that
9  situation, it is not aid in violation of the No Preference
10 Clause, because it's a *quid pro quo* transaction.  So, it's very
11 -- or I think the facts in our case are even better than in
12 *Americans United v. Rogers*, because this case deals with scrap
13 tires.  And so it is part of a *quid pro quo* transaction.  This is
14 not a situation where money is being given in aid of a church.
15 Really this is a situation where money is being given in aid of
16 public safety.  The scrap tires do not aid a church in the sense
17 that it can be used to teach religious doctrine or engage in any
18 kind of religious instructions.  Scrap tires is more akin to
19 sidewalk repairs, street repair, providing fire and police
20 protection.  And the Missouri Supreme Court *en banc* already said
21 that type of aid is permissible -- street repair, sidewalk
22 repair, fire and police protection.  So, if we have a --

23          THE COURT:  So, a sprinkler system in a church would not
24 violate -- if the state paid for the sprinkler system in a
25 church, that would not violate this clause of the Missouri

1    Constitution?

2         MR. OSTER:  Yeah.  What the court mentioned was sidewalk

3    repair and street repair.  And on the situation with the

4    sprinkler, they'd have to know more of the facts as to how that

5    program was going on.  If they're just watering the common

6    sidewalk area and grass on the common sidewalk area I would think

7    not.  That would be akin to sidewalk repair, street repair, fire

8    and police protection.  And the Missouri Supreme Court said that

9    type of aid is permissible.  So, if you have two types of

10   interest you want to look at, the broad spectrum of interest, in

11   one side you have the state's funding the devotional training of

12   clergy, which are the facts we had in *Locke v. Davey,* the state's

13   interest there is far different than the state's interest over

14   here which is dealing with street repair and sidewalk repair.

15   And we believe that in this case, providing scrap tires is much

16   more akin to sidewalk repair and street repair than it is the

17   devotional training of clergy.  And *Locke v. Davey* was a very

18   narrowly decided opinion.  Justice Rehnquist went through great

19   pains to say this only applies to the facts before us.  He said

20   when you're talking about the devotional training of clergy, it's

21   a different matter than on this other issue of allowing sidewalk

22   repair and street repair, and in our case, recycled tires.  I'd

23   like to direct the Court's attention to another Supreme Court

24   case called *Widmar*.  This is a very important case, because it

25   comes out of Missouri and it involves the application of the

1 Missouri Blaine Amendment. And in that case, a religious club

2 was wanting to meet at the University of Missouri of Kansas City

3 to engage in their religious instruction, they have a religious

4 meeting. And the states says no, our constitution does not allow

5 that, because we have a No Preference Clause and this would be

6 indirect aid to a religious organization. And the Supreme Court

7 says that doesn't cut it in this situation. You can't use your

8 state's No Preference Clause as an excuse, carte blanche approval

9 to engage in any kind of constitution violation. And so in our

10 case here we got to look at does a state's interest of

11 prohibiting a daycare from participating in a scrap tire program

12 simply because it's connected to a church, does that warrant

13 violating their constitutional rights. And in *Widmar* the Supreme

14 Court says they don't have carte blanche approval to do that.

15        THE COURT: Would it violate the U.S. Constitution if

16 the state refused to provide refreshments at those meetings --

17        MR. OSTER: It just --

18        THE COURT: -- if they provided refreshments at other

19 people's meetings?

20        MR. OSTER: In that situation, if that was one of the

21 parts of being a school club, a school program, I think that

22 would violate the Constitution if they discriminated against the

23 church in that way. And I think that would violate their rights.

24 Because in that context, you're talking about equal access. And

25 here we're also talking about equal access to this scrap tire

1    program.  Can the state discriminate against this daycare in

2    participating in this neutral government program simply because

3    it is connected to a church?  And we don't believe that that is

4    allowed.  Again, this is -- we are here on a motion to dismiss.

5            THE COURT:  Do you have any case on similar facts that

6    have upheld your position, on similar facts?

7            MR. OSTER:  I think the closest --

8            THE COURT:  What's your closest one?

9            MR. OSTER:  Yeah.  *Americans United v. Rogers* is

10   definitely a case that's very close to our facts.  If not, those

11   facts are even more egregious than the facts we have here.

12   *Widmar* is also one -- is a very good case for us.

13           THE COURT:  *Widmar* was a discrimination claim based upon

14   the Missouri Constitution?

15           MR. OSTER:  It was a claim where the plaintiffs in that

16   case brought a First Amendment claim saying that the state was

17   violating their constitutional rights.  The state defended itself

18   saying that our No Preference Clause gives us the right to do

19   this.  And that's about the same posture we have here.

20   Plaintiffs bring in federal constitutional claims -- in addition

21   to our state claim, but -- and then the state in defending itself

22   saying then we have this No Preference Clause which requires us

23   to do it.  So, that's the exact same question that was presented

24   to the courts in *Widmar* and the Supreme Court said that no in

25   that instance you can't use the state's No Preference Clause to

excuse a violation of your federal constitutional rights. And so

part of that analysis is going to be what are the interests of

the estate to prohibit the -- as applied to these facts. What

are the state's interest in not allowing the daycare to

participate in the scrap tire program and what are -- and so

that's why, in the motion to dismiss, we haven't even gotten to

the facts yet. That is through discovery. And so then after

discovery we're going to present motions for summary judgment.

Here the only issue is what have we pled.

THE COURT: How do you do discovery on what the interest

of the state is?

MR. OSTER: Well, for instance, has the state acted

contrary to their interests. And I can already point out two

situations right now where the State of Missouri has acted

contrary to their stated interest in maintaining the separation.

The first one is *St. Louis University vs. Masonic Temple*, which

is -- it's a published case so we can learn from it. But the

facts of the case are even more important, because in the facts

of *St. Louis University*, the State of Missouri decided it could

fund and build buildings for a Jesuit Roman Catholic university.

This a Catholic university, it's Jesuit. Their mission statement

was to be recognized and known as a Catholic Jesuit university.

THE COURT: Was there any distinction between caring for

small children with a desire to inculcate Christian values in

those small children in your program versus St. Louis University?

1        MR. OSTER:  Well, I think that's part of the facts that
2   we have to look at are if the State of Missouri has this high
3   interest in not allowing any kind of funding for religious
4   organizations and then they allow the funding of a religious
5   organization in *St. Louis University* and then also in our
6   *Americans United vs. Roger* case where they allowed the funding to
7   go to a religious school.  If they allow the fundings there, then
8   in our situation, we're dealing with a daycare that's connected
9   to a church, why won't the state allow for funding to go in this
10  situation?  That is discriminatory.  So, the facts are important
11  if we can show that the state has acted contrary to their
12  interest on previous occasions.  Then it really undercuts the
13  state's argument that they have this compelling interest when
14  they are regularly or have in the past looked the other way and
15  allowed for funding of these religious organizations.  In
16  addition, the whole analysis and inquiry that the state has used
17  as to why it can fund St. Louis University is constitutionally
18  problematic.  In the *St. Louis* case, the court said -- or the
19  state said we went and we looked at this university and we
20  decided with a religious statement, it was founded for religious
21  purposes.  It's known as a Jesuit Roman Catholic university and
22  it has all kinds of religious bylaws and mission statements.
23  Given that, the court said we wanted to look and see if religion
24  so pervaded the environment at the university that we would
25  conclude that it was controlled by a religious creed.  So, they

1   were looking at a religious --

2         THE COURT:  Is there any debate based on the face of

3   your complaint whether, in fact, the goal of your organization is

4   to promote Christian values in the program?

5         MR. OSTER:  Well, I think that it is a fair question of

6   fact as to how the goals of our daycare is --

7         THE COURT:  Well, is there any debate?  I mean, are you

8   saying that's not the goal?

9         MR. OSTER:  No.  Well, I guess what we're saying is, how

10  different are the goals of our client from the goals in St. Louis

11  University or these other religious schools that received

12  scholarships in *Americans United vs. Oliver*.  How different are

13  these religious goals?  Because what the State of Missouri is

14  looking to is how pervasive.  Not do you have a religious goal,

15  not do you have a religious mission but how pervasive is it.  So

16  they engaged in this pervasively religious analysis that the

17  Tenth Circuit found in *Colorado Christian v. Weaver* who violates

18  the Establishment Cause, because it excessively entangles the

19  state with religion.  So, when the state comes in and looks at

20  our client and says, well, no, religion is so pervasive here, but

21  we don't think it's so pervasive in these other contexts, we're

22  going to allow this funding and not allow the funding at, you

23  know, scrap tires at the daycare, then that analysis, that

24  determination excessively entangles the state with religion and

25  violates the Establishment Clause.  And so that is part of what

1  discovery will show in this case, is what are the state's

2  interest.  What are the state's interest specifically in regards

3  to this case of not allowing a daycare to participate in scrap

4  tires.  Scrap tires again are much more akin to street repair,

5  sidewalk repair than it would be the devotional training of

6  clergy.  And so the state has a -- they can't claim this carte

7  blanche interest or this wide interest in prohibiting the

8  training of clergy and then apply it to not allowing a daycare to

9  participate in the scrap tire program.  Those are totally

10  different interests.  So, that's why discovery should be allowed

11  to continue and we argue this case at the summary judgment stage.

12  So finally, this is a neutral program.  The state's interest --

13  the program involved here is a spectrum of interest where you

14  have compelling -- you have the -- it's not like the devotional

15  training of clergy.  This is more akin to sidewalk repair and

16  street repair.  And so we believe that at this point in the

17  litigation, we should be -- we have pled our claims and so we

18  should be allowed to go forward and present our case at summary

19  judgment.

20      THE COURT:  All right.

21      MR. OSTER:  Thank you.

22      MR. WILLOH:  I have four very short points.  I will

23  start with the sidewalk repair arguments.  I am unaware of any

24  case that says state or government money can't be used for

25  sidewalk repair that would benefit a church.  I think that's

because no one has sued to prohibit the church from being a
beneficiary of sidewalk repair. I don't think there is anything
unlawful about a government, federal or state, providing some
basic infrastructure if it happens to serve a church incidental.
The church is part of the community as well. My point is such an
expenditure is within the joints between the Free Exercise Clause
and the Establishment Clause.

THE COURT: How do I know what's within the joints and
not within the joints?

MR. WILLOH: I believe that is a case-by-case basis,
Your Honor, depending on the facts.

THE COURT: Okay. And then is there a need for
discovery if it depends on the facts?

MR. WILLOH: Yes. But -- but --

THE COURT: Yes. If there's a need for discovery, then
I shouldn't be granting your Motion to Dismiss.

MR. WILLOH: There is the need for discovery in those
kinds of cases, but not in this case.

THE COURT: Okay. Why is this case different?

MR. WILLOH: Because we aren't providing basic
infrastructure. It's not about that. This case is about the
state's interest as embodied in Article I, Section 7 which says
Missouri values the separation of church and state. It's a very
bright line there. This is different from a sidewalk repair, an
infrastructure situation where everybody benefits. The church

1   will receive a specific amount of money for its purposes.  That's
2   different than the incidental benefit of the provision of
3   infrastructure.  I want to read Paragraph 15 of the complaint, if
4   I can.  It's one sentence long.  "Through the learning center,
5   the church teaches a Christian world view to children and members
6   of the church, as well as the children of non-member residents of
7   Boone County and the surrounding area."  The mission of the
8   church, and through its daycare, is to promote a particular
9   religious view.  There's nothing wrong with that.

10          THE COURT:  Is that different from SLU?

11          MR. WILLOH:  I'm sorry, Your Honor?

12          THE COURT:  St. Louis University?

13          MR. WILLOH:  It is vastly different.

14          THE COURT:  Is that different?

15          MR. WILLOH:  Is it vastly different?

16          THE COURT:  How?

17          MR. WILLOH:  In the SLU case, there was -- the case
18  refers to pure academic freedom.  Its faculty was not required to
19  propose a particular religious viewpoint.  Its students were not
20  taught to espouse a particular religious viewpoint.  It's a
21  completely different case.

22          THE COURT:  Okay.

23          MR. WILLOH:  The state's interest -- I want to answer
24  Mr. Oster's question.  The state's interest is a high degree of
25  separation of church and state.  It's embodied in our

Constitution. That's perfectly lawful. The *Locke* case says

that. The *Luetkemeyer* district court said that. That is all

right. The difference here is that what is permissible for the

State of Missouri to do would have been back in 1820, to have a

constitutional reading that said scrap tire grant money can go to

churches. That would have been fine. But Missouri chose a

different path. That's fine, too. It's not unlawful. But the

plaintiff would have you believe that because the state -- the

church would have you believe that "in aid of" does not apply in

this case, but it does apply in this case.

THE COURT: That was one of my questions. How does it,

in fact, constitute aid? They're saying it's kind of a factual

dispute as to whether or not this was of any aid to the

institution.

MR. WILLOH: I think one thing that's not a fact in

dispute is that the church will get a check. That's the

difference from the other cases.

THE COURT: Okay.

MR. WILLOH: Thank you, Your Honor. I don't have

anything further.

THE COURT: All right. All right. I will take the

matter under advisement. It is certainly a complicated area of

the law whenever we start talking about the First Amendment or,

as you refer to it, the Blaine Amendments to the state

constitutions. So, I very much appreciate you all coming in

1  today and the matter is taken under advisement.  We have a class

2  here.  I'm not going to stay, but if any of you would like to,

3  you know, if there are questions that you feel that you can

4  answer for the class or, you know, your strategy or your styles,

5  obviously I would not want to hear that.  But they might very

6  well benefit from having any more information or about being able

7  to ask you questions about this process.  So, I am going to

8  recess court, but, Dean Dessem, if there are any additional

9  questions that you might have, please feel free to engage the

10  attorneys if they are kind enough to stay a few moments.  All

11  right.  Court is in recess.  And my staff would come with me.

12                  (Court Adjourned at 11:32 a.m.)

1

2

3

4

5

6

7

8

9         I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
10  above-entitled matter.

11

12       /s/ Lissa C. Whittaker       March 14, 2014
        Signature of transcriber          Date
13

14

15

16

17

18

19

20

21

22

23

24

25