## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

TRINITY LUTHERAN CHURCH OF
COLUMBIA, INC.,

Plaintiff,

v.

Case No. 2:13-cv-4022-NKL

CAROL S. COMER, in her official
capacity as Director of the Missouri
Department of Natural Resources Solid
Waste Management Program,

Defendant.

## ORDER

This case arose out of the Department of Natural Resources Solid Waste Management
Program's denial of the application by Trinity Lutheran Church of Columbia, Inc. for a playground
resurfacing grant. The Department denied the application because of its policy disqualifying
religious organizations from receiving such grants. Trinity Lutheran claimed that the denial on
this ground violated, *inter alia*, the Free Exercise Clause of the First Amendment. *See* Doc. 1.

On September 26, 2013, the Court granted Defendant's motion to dismiss Trinity
Lutheran's claims, with prejudice. On January 7, 2014, the Court denied Trinity Lutheran's
motion to reconsider and to file an amended complaint. On May 29, 2015, the Eighth Circuit
affirmed. The Eighth Circuit also denied rehearing en banc.

On June 26, 2017, however, the United States Supreme Court held that Defendant's denial
of Trinity Lutheran's application for a playground resurfacing grant for which it was otherwise
qualified on the sole ground that it was a religious institution violated the Free Exercise Clause of
the First Amendment. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2025
(2017). The parties thereafter entered into a stipulation agreeing that "Plaintiff is the prevailing

party in this litigation" and that they would "submit the determination of the reasonableness and amount of Plaintiff's attorneys' fees and costs" to the Court. *Id.*, p. 3.

Trinity Lutheran now moves for attorneys' fees and expenses totaling $891,610.41. Defendant acknowledges that Trinity Lutheran is entitled to fees and costs, but disputes on various grounds the reasonableness and amount of the fees and costs Plaintiff seeks. For the reasons discussed below, the Court grants in part and denies in part Plaintiff's motion for fees.

## I.   ANALYSIS

The Court may allow "the prevailing party" in certain civil rights actions to recover "a reasonable attorney's fee . . . ." 42 U.S.C. § 1988. Defendant stipulated that Trinity Lutheran is "the prevailing party" in this action. Thus, the question before the Court is whether the fees and expenses that Trinity Lutheran seeks are reasonable.

### a.   Fees

The basis for any fee award under § 1988 is the lodestar calculation, the product of a reasonable hourly rate and the number of hours reasonably expended on the litigation. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."); *Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005) ("The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rates."). Thus, to determine whether the fees that Trinity Lutheran seeks are reasonable, the Court must determine (1) a reasonable rate for the attorneys' time and (2) the number of hours reasonably expended on the litigation.

The party seeking the award must submit documentation supporting the requested amount, making "a good faith effort to exclude from [the] fee request hours that are excessive, redundant,

or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434. The goal of the lodestar method is to "roughly approximate[] the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A.*, 559 U.S. 542, 551, 130 S. Ct. 1662, 1672 (2010).

Trinity Lutheran seeks legal fees for the following billers (listed from highest to lowest total requested fees) for litigating the case "before the district court, Eighth Circuit, and Supreme Court"—until it began working on the motion now before the Court:

| Name | Experience | Hours | Hourly Rate | Total |
|------|-----------|-------|-------------|-------|
| David Cortman | 22 years | 513.99 | $695 | $357,223.05 |
| Erik Stanley | 18 years | 385.8 | $495 | $190,971 |
| Rory Gray | 10 years | 247.8 | $350 | $86,730 |
| Joel Oster | 20 years | 97.9 | $450 | $44,055 |
| Michael Whitehead | 40+ years | 76.1 | $370 | $28,157 |
| Jonathan Whitehead | 13 years | 84.6 | $300 | $25,380 |
| Jordan Lorence | 30+ years | 40 | $550 | $22,000 |
| Christiana Holcomb | 4 years | 70.6 | $200 | $14,120 |
| Deb Hardin (Legal Asst.) | -- | 135.5 | $100 | $13,450 |
| Kevin Theriot | 24 years | 14.8 | $550 | $8,140 |
| Christen Price | 5 years | 20.9 | $150 | $3,135 |
| Cynthia Fisher (Legal Asst.) | -- | 2.75 | $100 | $275 |
| | | | TOTAL | $794,966 |

In addition, Trinity Lutheran seeks fees attributable to settlement discussions following the Supreme Court decision as well as papers it filed in initial support of this motion for fees, as follows:

| Name | Experience | Hours | Hourly Rate | Total |
|---|---|---|---|---|
| David Cortman | 22 years | 3.1 | $695 | $2,154.50 |
| Erik Stanley | 18 years | 14.1 | $495 | $6,979.50 |
| Jeremiah Galus | -- | 28.4 | $350 | $9,940 |
| Ray Kaselonis | -- | 37.5 | $450 | $16,875 |
| Jonathan Whitehead | 13 years | 3.2 | $300 | $960 |
| Michael Whitehead | 40+ years | 1 | $370 | $370 |
| | | | TOTAL | $37,279.00 |

Trinity Lutheran also seeks fees associated with the reply in support of this motion as follows:

| Name | Experience | Hours | Hourly Rate | Total |
|---|---|---|---|---|
| Jeremiah Galus | -- | 27.4 | $350 | $9,590 |
| Deb Hardin (Legal Asst.) | -- | 1 | $100 | $100 |
| | | | TOTAL | $9,690 |

In total, Trinity Lutheran seeks $840,605.00 in fees for the work of twelve attorneys and two legal assistants.

### 1. Whether the Hourly Rates Are Reasonable

In the Eighth Circuit, "a reasonable hourly rate generally means the ordinary fee for similar work in the community." *Little Rock Sch. Dist. v. State Ark. Dep't of Educ.*, 674 F.3d 990, 997 (8th Cir. 2012) (quotation marks and citations omitted). Nonetheless, where local community rates would "not be 'sufficient to attract experienced counsel' in a specialized legal field," the appropriate rate may be determined by reference to "a national market or a market for a particular legal specialization . . . ." *Id.* (citations omitted). However, this "does not mean that a district court is forbidden in the ordinary case to focus on the community in which the case was litigated." *Miller v. Dugan*, 764 F.3d 826, 831-32 (8th Cir. 2014). Indeed, if "a local lawyer, adequately

versed in civil rights litigation, would have sufficed to attain the result that [the party's attorney] received while charging the ordinary [local] rate," or if the party's attorney "did not display the excellence, or achieve the time savings, implied by [his] higher rate," the Court would be justified in basing a fee award on local market rates. *Id.*

The burden of establishing the appropriate rate rests on the fee applicant. *See Blum v. Stenson*, 465 U.S. 886, 895 n.11, 104 S. Ct. 1541, 1547 (1984) ("To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence -- in addition to the attorney's own affidavits -- that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.").

Plaintiff argues that its counsel are "leaders in the field" of First Amendment litigation and therefore warrant fees reflecting "the market from which [they] traveled." Doc. 57, p. 5. The three attorneys who were "primarily in charge" of the case before the Court and the Eighth Circuit, Erik Stanley, Joel Oster, and Christiana Holcomb of the Alliance Defending Freedom ("ADF"), each were based in Kansas City initially (although Mr. Stanley and Ms. Holcomb later moved to ADF's Phoenix office). Plaintiff appears to concede that a "Missouri market" rate should apply to litigation before the Court and the Eighth Circuit. *See id.*, p. 7. These attorneys propose to bill $495, $450, and $200 an hour, respectively.

When the case reached the U.S. Supreme Court, Mr. Stanley and two other ADF attorneys, David Cortman and Rory Gray, "took the lead." *Id.*, p. 5. Plaintiff insists that a different rate should apply to work before the Supreme Court. *See id.*, p. 7. Mr. Cortman and Mr. Gray propose to bill $695 and $350 an hour, respectively. Plaintiff also seeks fees for others attorneys at rates

of $550, $450, $370, $350, $300, and $150 per hour, and fees for legal assistants at the rate of $100 an hour.

Having researched fee awards in First Amendment litigation, the Court finds that most of the rates Plaintiff's attorneys propose are not reasonable. As a preliminary matter, this is not a case in which the plaintiff was unable to find local counsel who could and would take its case. Trinity Lutheran purports to have selected ADF as its counsel "[a]fter learning that [ADF] attorneys were located in the Kansas City area . . . ." Doc. 57-14, ¶ 5. In other words, Trinity Lutheran selected its counsel in part because they were local. Moreover, Trinity Luthern subsequently added two additional Missouri attorneys, Michael Whitehead and Jonathan Whitehead, to its legal team, which further establishes that sufficiently experienced and skilled counsel was available locally. *See Little Rock Sch. Dist.*, 674 F.3d at 997-99 ("The problem with the Joshua Intervenors' argument is that their own affidavits belie any notion that local community rates were not 'sufficient to attract experienced counsel.' In particular, the Joshua Intervenors' affidavits establish that their local counsel, Messrs. Walker and Pressman, are both experienced and lauded experts in the field of civil rights litigation. In light of the fact that Mr. Walker billed his time for this matter at $400 per hour and Mr. Pressman billed his time at $325 per hour (and the reasonableness of these rates has not been specifically challenged), it cannot be said that the claimed national market rates were required to attract experienced civil rights counsel.").

Furthermore, there is no indication that Trinity Lutheran made any attempt to find other local counsel to take its case. Trinity Lutheran's representative states that it "knew of no other attorneys—either based in Columbia, MO, or in the nearby areas of Kansas City and St. Louis—who had experience handling First Amendment cases like this one and who would be willing to represent the church for free, with absolutely no promise of future payment." Doc. 57-14, ¶ 6.

Putting aside the fact that Trinity Lutheran quickly found exactly the type of local counsel it sought, the fact that Trinity Lutheran initially did not "kn[o]w" of other local attorneys who would take the case does not mean that it was *unable* to find other local attorneys to represent it. *See Morse v. Republican Party*, 972 F. Supp. 355, 364 (W.D. Va. 1997) (rejecting argument that "'the specialized nature of the voting rights bar' [wa]s such that no local attorney existed to represent plaintiff" and finding that plaintiffs failed to rebut the presumption that local rates apply because there was "no suggestion that plaintiffs unsuccessfully sought to obtain local attorneys to represent them in th[e] litigation"). For these reasons, it would be inappropriate to view the fees in this case through the lens of a national, rather than a local, market.[1]

Plaintiff has not presented—and the Court has not found—case law suggesting that different rates should apply to work performed before the U.S. Supreme Court than apply to the other work in the case. The issues presented in this forum were largely the same as those presented to the Eighth Circuit and the Supreme Court. In addition, as discussed further below, many of the "local" attorneys for Plaintiff had experience litigating cases before the Supreme Court. These attorneys have not suggested that their hourly rates vary with the litigation forum. Nor does the policy interest in encouraging lawyers to take cases that might otherwise appear unattractive apply in the Supreme Court context—where many attorneys would happily argue a case for free, just for the privilege of appearing before the highest court of the country. The Court therefore is unpersuaded by the Declaration of Paul Clement (Doc. 57-15), which considers the fees sought in this case through the lens of U.S. Supreme Court practice—an artificial and, in any event, inapplicable "market."

---

[1] Accordingly, the Court gives no weight to the Declarations of Wayne Bond and George M. Weaver, which address legal billing rates in the Atlanta market. Doc. 57-17, ¶ 1; Doc. 57-18, ¶ 1.

Federal courts in Missouri have found hourly rates of between $200 and $375 reasonable for attorneys experienced in First Amendment law. *See Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014) (affirming order in *Snider v. Peters*, 928 F. Supp. 2d 1113, 1116-17 (E.D. Mo. 2013), finding rates of $300 and $225 per hour appropriate for attorneys with "expertise in First Amendment litigation" based on St. Louis market because plaintiff was unable to find counsel in Cape Girardeau); *Missourians for Fiscal Accountability v. Klahr*, No. 14-4287-ODS, 2017 U.S. Dist. LEXIS 219827, at **3-6 (W.D. Mo. Apr. 10, 2017) (rejecting as unreasonable in Mid-Missouri proposed rates of $475 and $395 for attorneys with First Amendment experience and instead finding hourly rates of $375 and $300 reasonable, and reducing other attorney rates to $200 per hour); *Phelps-Roper v. City of Manchester*, No. 09-1298 CDP, 2010 U.S. Dist. LEXIS 118056, at **6-7 (E.D. Mo. Nov. 8, 2010) (finding $225 a reasonable hourly rate in case concerning "whether a city ordinance violated the First Amendment"); *Balaban v. Lincoln Cty. Ambulance Dist.*, No. 06-1268 CDP, 2008 U.S. Dist. LEXIS 29011, at *4 (E.D. Mo. Apr. 9, 2008) (approving $350 hourly rate for attorney in St. Louis employment case concerning First Amendment rights).

Indeed, throughout the country, courts have awarded fees in excess of $450 in First Amendment cases only where the rates were consistent with the local market. *See, e.g., Garcia v. Montgomery Cty.*, No. 12-3592, 2018 U.S. Dist. LEXIS 47565, at **25-31 (D. Md. Mar. 22, 2018) (rejecting argument that Washington, D.C. rates should apply in "adjacent" Maryland despite acknowledging that "First Amendment law is a specialized field," and finding "no basis to support the conclusion that no Maryland-based counsel was qualified and available to litigate his claims in this case," and awarding fees to most experienced attorney consistent with the court's guidelines regarding hourly rates, at $475 an hour, and to less experienced attorneys at rates of $425 and $300

an hour); *Rocky Mt. Christian Church v. Bd. of Cty. Comm'rs*, No. 06-00554, 2010 U.S. Dist. LEXIS 102081, at **12-15 (D. Colo. Sep. 13, 2010) (finding that "it was reasonable for RMCC to seek an attorney with specialized knowledge and skills in the areas of constitutional law, including the First Amendment, and appeals in the federal courts of appeal" and approving, "in the context of the Denver market," where partners may charge as much as $750 per hour, an hourly rate of $547.32, which was "seventy percent of [attorney's] customary hourly rate").

Courts in various other jurisdictions across the nation—including in markets with billing rates that are far higher than those in Missouri—have awarded between $160 and $450 in hourly fees to counsel with substantial First Amendment law experience. *See Deferio v. City of Syracuse*, No. 16-361, 2018 U.S. Dist. LEXIS 103596, at *10 (N.D.N.Y. June 21, 2018) (finding rate of $350 an hour appropriate for attorneys with over thirty years of experience in First Amendment civil rights litigation); *Thayer v. City of Worcester*, No. 13-40057, 2017 U.S. Dist. LEXIS 46644, at **6-9 (D. Mass. Mar. 29, 2017) (rejecting proposed rates ranging from $750 to $284 per hour and applying rates of $450 to $200 per hour in case involving "new legal theories" relating to First Amendment law); *Stockstill v. City of Picayune*, No. 16-0004, 2017 U.S. Dist. LEXIS 203113, at **6-7 (S.D. Miss. Dec. 11, 2017) (rejecting proposed $425 rate in favor of $225 hourly rate in First Amendment case); *Ranize v. Town of Lady Lake*, No. 11-646, 2015 U.S. Dist. LEXIS 29090, at *9 (M.D. Fla. Mar. 10, 2015) (rejecting proposed hourly rate of $500 in favor of $375 rate in First Amendment case and collecting decisions from between 2008 and 2015 in the Middle District of Florida awarding fees in First Amendment cases at hourly rates of between $160 and $400); *Corral v. Montgomery Cty.*, 91 F. Supp. 3d 702, 715-16 (D. Md. 2015) (reducing hourly rates to $410 and $390 per hour in "complicated" First Amendment case); *Backpage.com LLC v. Cooper*, No. 12-cv-00654, 2014 U.S. Dist. LEXIS 199576, at *6 and *11 (M.D. Tenn. May 20, 2014)

(finding proposed rates of between $235 and $435 per hour to be "reasonable" in case concerning constitutional issues that "were quite complex"); *Rivers v. Ledford*, 666 F. Supp. 2d 603, 609 (E.D.N.C. 2009) (reducing hourly rate for lawyer who had "demonstrated his prominence in First Amendment law" to $300 and rate for another attorney to $250); *Imaginary Images, Inc. v. Evans*, No. 08-398, 2009 U.S. Dist. LEXIS 73193, at **8-9 (E.D. Va. Aug. 12, 2009) (finding hourly rates of $300 per hour and $250 per hour "to be standard rates for attorneys, especially considering the specialized knowledge of attorneys who work on First Amendment cases"); *ACLU of Ky. v. McCreary Cty.*, No. 99-507, 2009 U.S. Dist. LEXIS 22206, at **15-17 (E.D. Ky. Mar. 13, 2009) (approving $300 hourly rate where case "involve[d] a specialty area of the law – federal constitutional law, specifically Establishment Clause law – that very few lawyers practice" and where attorney was awarded the same rate in two other First Amendment cases); *Glidewell v. City of Greenville*, No. 09-1932, 2012 U.S. Dist. LEXIS 37683, at **21-23 (D.S.C. Feb. 23, 2012) (awarding fees at rate of $275 per hour for counsel "who was nationally recognized for . . . prominence as an attorney specializing in First Amendment law"); *Republican Party of Minn. v. White*, 456 F.3d 912, 920-21 (8th Cir. 2006) (finding rates of $425 and $400 per hour reasonable where attorneys had "expertise" in First Amendment cases); *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, No. 02-4549, 2006 U.S. Dist. LEXIS 62966, at **79-81 (D.N.J. Sep. 5, 2006) (accepting proposed hourly rate of $275 for attorneys with "particular expertise in the area of 'religious freedom litigation' and 'equal access cases'"); *Sullivan v. City of Augusta*, 625 F. Supp. 2d 28, 43-44 (D. Me. 2009) (approving hourly rates of between $240 and $300 after taking into account, *inter alia*, "the complexity of the field of First Amendment law" and "the sophistication required to successfully maintain the claims pressed in this case from federal trial court and through appeal").

It is noteworthy that Plaintiff's attorneys have been awarded fees in the last decade at rates that were far lower than the rates they seek now. *See Brown v. City of Pittsburgh*, No. 06-393, 2010 U.S. Dist. LEXIS 52927, at **43-44 (W.D. Pa. May 27, 2010) (awarding Mr. Cortman fees at rate of $350 per hour); *Heinkel v. Sch. Bd.*, No. 04-184-33, 2007 U.S. Dist. LEXIS 69683, at **29-35 (M.D. Fla. Sep. 20, 2007) (finding Mr. Stanley entitled to rate of $175, rather than his requested $225, per hour, and finding Mr. Oster entitled to $150, rather than his requested $200 per hour); *Farnsworth v. City of Mulvane, Kansas*, No. 08-1150, 2010 WL 11565336, at *5 (D. Kan. Feb. 5, 2010) (finding Mr. Oster entitled to $175, rather than the $250 he requested, per hour). While these rates do not constitute binding precedent, they confirm what the case law in this region and elsewhere shows: most of the rates that Plaintiff's attorneys now seek are not in keeping with the local market.

The Declaration of James Layton—the attorney for Defendant who argued this case before the United States Supreme Court—further establishes that lawyers in Missouri experienced in litigating constitutional issues do not charge the kinds of rates that Plaintiff's counsel propose. Attorney Layton handled civil appeals and constitutionality cases for the Missouri Attorney General's Office for over 22 years. Doc. 63-1, ¶ 1. He has now argued before the United States Supreme Court four times, and has argued before the Missouri Supreme Court more than 90 times. *Id.*, ¶ 4(a). He has argued before other state and federal appellate courts more than 100 times. *Id.*, ¶ 4(b). He argued this case before the Eighth Circuit, where Defendant prevailed. *Id.*, ¶ 8(b). Yet, as of March and April 2017, when he was an attorney in private practice and the Missouri Attorney

General asked him to argue this case before the United States Supreme Court, his billing rate was $295 an hour.[2]  *Id.*, ¶¶ 6, 8(e), 7.

The case law and other evidence thus overwhelmingly indicate that Plaintiff's counsel's rates are on the whole out of keeping with the market in Missouri—and indeed, with the market in various other parts of the country—for First Amendment litigators.  Plaintiff's attorneys have not provided evidence of fee awards in similar cases or other objective evidence showing that their claimed rates are reasonable.  *See Blum*, 465 U.S. at 895, 104 S. Ct. at 1547 n.11 (stating that fee applicant bears the burden of producing "satisfactory evidence -- in addition to the attorney's own affidavits -- that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation").

ADF's David Cortman's work on this case consisted of "legal research, briefing, and argu[ing] the appeal before the Supreme Court of the United States."  Doc. 54-3, ¶ 2.  He has practiced law for over 21 years.  *Id.*, ¶¶ 2-3.  He states that he has served as lead counsel in seven cases before the Supreme Court, and as co-counsel in four other cases.  *Id.*, ¶ 9.  To date, he has argued two cases before the Supreme Court, including this one.  *Id.*  He states that his "billing rate of $695.00 per hour for [his] time in this case is consistent with the prevailing market rate in the

---

[2] In contrast, the Declaration of Charles W. Hatfield, Doc. 57-16, explains that Plaintiff's counsel's rates are "lower" than his standard rates from 2015-2017.  However, the declaration says nothing of Mr. Hatfield's rates from 2013 through 2015, when much of the litigation in this case took place.  Furthermore, the declaration is from an attorney "listed in Best Lawyers in America for Commercial Litigation and Government Relations."  *Id.*, ¶ 5.  The rates that may apply in commercial litigation and matters concerning "campaign finance law" are no doubt higher than rates applied in First Amendment litigation—even complex First Amendment litigation—because of the different markets in these "specialized" areas of the law.  Finally, Mr. Hatfield references "the long trial and appellate history before this case appeared before the United States Supreme Court . . . ."  *Id.*, ¶ 13.  However, the Court originally decided this case upon a motion to dismiss, and then denied a motion to reconsider.  In short, there was no "long trial" history in this case.  Given Mr. Hatfield's very different area of practice and his apparent lack of familiarity with the case, the Court gives little weight to his declaration.

Atlanta area" and "extremely reasonable as compared with attorneys who practice before the Supreme Court of the United States . . . ." *Id.*, ¶¶ 21-22. Defendant asks that the rate for Mr. Cortman "be reduced from $695 to no more than $450 . . . ." Doc. 63, p. 9. The Court finds that $695 is not a reasonable rate for First Amendment litigation in Missouri, or even in most other jurisdictions in the country. Although Missouri case law supports a rate of up to $375 per hour for an experienced First Amendment litigator, in light of Defendant's apparent concession that $450 would be a reasonable hourly rate, the Court reduces Mr. Cortman's rate to $450 per hour.

ADF's Jordan Lorence states that he worked on "select aspects of this case related to Trinity Lutheran Church's successful appeal to the United States Supreme Court." Doc. 57-6, ¶ 2. He has over 30 years of experience in civil rights and constitutional law, with particular focus on free speech and religious liberties. *Id.*, ¶ 3. He served as lead counsel in a case that went before the U.S. Supreme Court in 2000 and has served as associate counsel on other Supreme Court cases. *Id.*, ¶ 4. He claims that his proposed billing rate of $550 is "consistent with the prevailing market rate in the Kansas City area" and "very reasonable for practice before the United States Supreme Court . . . ." *Id.*, ¶¶ 15-16. However, the requested rate is not reasonable in Missouri or in many other parts of the country. In light of the fact that Mr. Lorence has had less Supreme Court experience than Mr. Cortman—a factor which may be reflected in the difference between their proposed rates—the Court finds that $350 per hour is an appropriate rate for Mr. Lorence.

ADF's Kevin Theriot's work on this case involved "primarily . . reviewing and editing briefing related to the appeal to the Eighth Circuit Court of Appeals and also to the United States Supreme Court." Doc. 57-7, ¶ 2. He has twenty-four years of experience, focused on constitutional law, specifically religious freedom, freedom of expression, and civil rights law. He has served as lead or co-counsel in several constitutional cases. Although he seeks compensation

for fewer than 15 hours spent on this case, he declares that it "required extensive research and writing in order to vindicate Trinity's constitutional rights," which demanded "extra amounts of [his] time" and "precluded [him] from working on other matters." In addition, although Plaintiff's calculations show his rate as $550 per hour (*see* Doc. 57-1), Mr. Theriot's declaration says his billing rate is "$500.00 per hour." Doc. 57-7, ¶ 15. Mr. Theriot claims that $500 "is consistent with the prevailing market rate in the Missouri area" for complex First Amendment litigation and "very reasonable for practice before the United States Supreme Court . . . ." *Id.*, ¶¶ 15-16. Taking into account his experience, but also the rates employed in First Amendment cases in Missouri and throughout the nation, the Court finds that a rate of $325 is reasonable for Mr. Theriot.

ADF's Erik Stanley worked on this case at the trial and appellate levels. Doc. 57-4, ¶ 2. He was "the principal brief writer" in this case. *Id.*, ¶ 11. He has practiced law for over eighteen years, with a focus on religious freedom, freedom of expression, and civil rights litigation. He has experience acting as second chair in this and at least one other Supreme Court case. *Id.*, ¶ 10. He claims that his billing rate of $495 is "consistent with the prevailing market rate in the Kansas City area" and "reasonable in light of [his] experience in constitutional law." *Id.*, ¶ 18. In light of the rates established in other federal cases from this region, however, the Court finds a rate of $325 reasonable for Mr. Stanley.

ADF's Ray Kaselonis worked only on the motion for fees in this case. Doc. 57-10, ¶ 2. Previously, he worked on legislation for the U.S. House of Representatives' Office of the Law Revision Counsel, but he left in October 2014 to pastor a church. *Id.*, ¶¶ 6-7. In September 2017, he began practicing law at ADF. *Id.*, ¶¶ 8-9. He proposes a billing rate of $450. However, given his limited litigation experience, the Court cannot approve a rate of greater than $200 for Mr. Kaselonis.

Plaintiff has submitted no declaration from Joel Oster, a former ADF attorney for whose work it seeks a rate of $450 per hour. Mr. Oster's experience and involvement in this case is described most fully in the Declaration of Erik W. Stanley, as follows:

> Attorney Joel Oster, who has practiced law for 20 years and whose reasonable billing rate is $450.00 per hour, incurred 103.2 hours in this case. Mr. Oster primarily litigated this case before this Court and also the Eighth Circuit Court of Appeals prior to his departure from the firm."

Doc. 57-4, ¶ 24. Plaintiff does not explain whether or to what extent Mr. Oster's experience focused on litigation or First Amendment issues, or how much experience he had before federal appellate and district courts. Based on the representation that Mr. Oster practiced law for twenty years and the assumption that he focused on First Amendment issues while at ADF (and without knowing the length of his tenure at ADF), and in light of the hourly rates found appropriate for Mr. Oster in other federal cases, the Court finds an hourly rate of $300 to be reasonable for him.

Michael Whitehead identifies himself as "local counsel and co-counsel for Trinity Lutheran." Doc. 57-12, ¶ 2. He stated that he "engaged in research, drafting and reviewing of the original complaint and other pleadings and briefs; reviewing, analyzing, and responding to pleadings and briefs filed by the defense; reviewing and evaluating numerous *amicus curiae* briefs filed in the case, and incorporating arguments or responses thereto into Plaintiff's briefing and preparation; preparing for and participating in moot courts to prepare for arguments; meeting with clients in preparation for various aspects of the case; and communicating with the client, co-counsel, opposing counsel, court personnel, and the media." *Id.* He also claims that his "responsibilities in this case included supervising the work performed by me, including its quality and the quantity or time expended for any given service." *Id.*, ¶ 15. He is a solo practicioner who has practiced law for over 40 years, including substantial litigation work in the areas of religious freedom, freedom of expression, and civil rights. *Id.*, ¶ 3. He has represented various religious

organizations, including as general counsel, lead counsel, and co-counsel. *Id.*, ¶¶ 7-9. He appeared as co-counsel in one other matter before the U.S. Supreme Court. *Id.* From 2013 to 2017, his "standard billing rate was in the range between $250 to $370 per hour." *Id.*, ¶ 14. Yet, he claims to have "exercised [his] billing judgment by . . . using the standard rate of $370 per hour." *Id.*, ¶ 18. Given the Court's findings concerning local rates and the fact that Michael Whitehead's billing rate admittedly was at times as low as $250 during the relevant time period, and also given that review of his time records indicates that he principally focused on public relations matters rather than litigation, the Court finds an hourly rate of $300 to be reasonable for Michael Whitehead.

ADF's Rory Gray's primary contributions in this case involved legal research and writing and reviewing and revising court filings when this case reached the U.S. Supreme Court. Doc. 57-5, ¶ 2. After completing two consecutive appellate clerkships, he began practicing law at ADF in 2011, focusing on civil rights, particularly free speech and religious liberties. *Id.*, ¶¶ 3-5. He has assisted in litigating various First Amendment cases, including in federal courts of all levels and in various jurisdictions. He states that ADF's attorneys' fee rates "are determined by billing practices in the legal market where a case is pending," but proceeds to explain that his billing rate of $350 is consistent with the market in Atlanta. *Id.*, ¶ 17, 19. Given that Mr. Gray has been litigating and working in First Amendment law for approximately seven years, the Court finds that a rate of $275 is in keeping with the local market.

ADF's Jeremiah Galus, who assisted in the preparation of the plaintiff's fee motion papers, has been involved in litigation for approximately 9 years. Doc. 57-11, ¶ 2, 4, 6. However, he began focusing on civil rights and constitutional litigation, particularly with regard to churches, just three years ago. Mr. Galus claims that his rate of $350 is consistent with the market in Kansas

City and Phoenix. However, taking account of Missouri rates and Mr. Galus's experience, the Court finds $275 to be an appropriate hourly rate for him.

Jonathan Whitehead has been involved in this case since 2013. Doc. 57-13, ¶ 2. His practice includes "complex civil litigation, as well as the law surrounding nonprofit, religious and tax-exempt organizations." *Id.*, ¶ 3. He has served as lead or co-counsel in various cases involving the application of Missouri law to religious organizations. *Id.*, ¶ 8. He became involved in this case at his father Michael Whitehead's request. *See, e.g.,* ¶ 13. He states that his rate of $300 per hour is "standard . . . for non-profit organization clients" in Kansas City and mid-Missouri. However, the Court finds that a rate of $250 is more appropriate, in light of his experience and expertise, and the local market.

ADF's Christiana Holcomb's contributions to this case included conducting legal research, drafting pleadings, and communicating with the client. Doc. 57-8, ¶ 2. She has been working as an attorney for four years, exclusively in civil rights, particularly free speech and religious liberties. *Id.*, ¶ 3. She has helped to litigate cases before the Supreme Court as well various federal appellate and district courts. *Id.* She states that her billing rate of $200 per hour is reasonable in the Kansas City area. The Court finds this rate reasonable.

Christen Price's contributions to this case involved legal research and "drafting a legal memorandum." Doc. 57-9, ¶ 2. She has practiced law for five years, but has focused on civil rights, freedom of religion, association, and speech since 2015. *Id.*, ¶¶ 3-4. She states that her billing rate of $150 is consistent with the market rate in the Kansas City area. The Court finds this rate reasonable.

Cynthia Fisher is a "legal assistant and paralegal" who has worked with Michael Whitehead's Whitehead Law Firm since 2002. Doc. 57-12, ¶ 13. Plaintiff seeks reimbursement

for her time at the rate of $100 an hour.  Plaintiff also seeks reimbursement at the rate of $100 per hour for "[l]egal assistant" Deb Hardin.  Doc. 57-4, ¶ 25.  The Court finds these rates reasonable. *See* "Billing Rates 2018," *Missouri Lawyers Weekly*, August 2018 (showing median rate of $120 for support staff).

## 2.  Whether the Hours Expended Were Reasonable

The Court next must review the hours expended by the attorneys to ensure that they are reasonable.  "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed.  Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433.  Furthermore, the Court "should exclude from this initial fee calculation hours that were not 'reasonably expended.'  Cases may be overstaffed, and the skill and experience of lawyers vary widely." *Id.*, at 434.  "Billing judgment" is just as important here as it is in the private sector. *Id.*  "Hours that are not properly billed to one's client also are not properly billed to one's *adversary* pursuant to statutory authority." *Id*.

The Court has reviewed each billing entry in Plaintiff's submissions and reduced the hours where it was appropriate to do so.  The Court's reductions fall into the following categories:

1. *Administrative tasks that should not have been performed by an attorney*.  For example, the Court eliminated time devoted to the retainer agreement between Plaintiff and its lawyers.  Engaging a client is an administrative task for which clients ordinarily are not billed. The Court also reduced by 50% time attorneys spent compiling briefs, orders, or cases cited therein, as well as time spent preparing summary charts of time expended.  Such tasks are normally performed by administrative staff at far lower rates.

2. *Excessive moot courts and related travel*.  Plaintiff seeks compensation for multiple attorneys for at least fourteen different moot courts, including in Arizona, Georgia, Massachusetts,

and Washington, D.C. (separate from travel to D.C. for the oral argument itself), in preparation for Supreme Court argument. *See* Doc. 57-2 (referencing moot courts on October 12 and October 20, 2016 and March 20, March 23, March 27, March 29, April 3, April 4, April 6 (two moot courts), April 7, April 10 (two moot courts), April 12, and April 17). The Court recognizes that a few moot courts are likely to be helpful in preparation for Supreme Court advocacy. But the number, location, and staffing of these moot courts was unreasonable. The ordinary paying client would balk at funding such a number of moot courts, partly because at some point they would be more likely to benefit the participants and observers personally rather than the client. Accordingly, the Court eliminated fees and expenses for attorney time spent preparing for or participating in all but the last four moot courts—the number of moot courts in which Defendant's lead counsel participated (*see* Doc. 63-1, ¶ 10). In other words, the Court is not awarding fees or expenses for moot court preparation, participation, or related travel (to the extent that no chargeable work was performed during the travel time) before April 9, 2017.

   3. *Public relations*. The Court has eliminated charges for entries reflecting discussions with media. Michael Whitehead's declaration, for example, states that "some" of his work in this case "involved responding to local media requests and coordinating client response to such matters." Doc. 57-12, ¶ 19; *see also, e.g., id.*, p. 17 (February 6, 2014 entry: "Review email . . . re media release on filing the appeal."); *id.*, p. 24 (April 12, 2017 entry: "Media call. Research file to answer media question. Interview with Missouri Lawyers Weekly, Scott Lauck, KCMO."). Although Whitehead acknowledges that "such work was not directly related to the preparation or presentation of the Plaintiff's case to any court," he reduced such time only by "about 25%." *Id.*[3]

---

[3] In contrast, Jonathan Whitehead stated that he did not submit a claim for hours spent responding to local media requests and coordinating client response to such matters," recognizing that "such

Fees for time spent discussing media matters cannot be shifted to Defendant. *See Halderman v. Pennhurst State School & Hosp.*, 49 F.3d 939, 942 (3d Cir. 1995) (noting that "the proper forum for litigation is the courtroom, not the media," and precluding recovery for "hours of 'work related to writing press releases, speaking with reporters and otherwise publicizing'" matters under litigation). Similarly, the Court will not shift fees associated with discussions with a congressional representative. *See*, *e.g.*, Doc. 57-12, p. 25 (May 9, 2017 entry: "Meeting with client and Rep Hartzler to discuss issues at hearing.").

4. *Time spent soliciting, coordinating, and reviewing supporting amicus filings*. The Court finds that time spent coordinating amici and reviewing their briefs—as distinct from reviewing and responding to opposing amicus filings—should not be shifted. *See, e.g., Glassroth v. Moore*, 347 F.3d 916, 919 (11th Cir. 2003) ("The district court should not award plaintiffs any attorney's fees or expenses for work done in connection with supporting amicus briefs. (A reasonable amount of time spent reading and responding to opposing amicus briefs is, of course, compensable.)"); *North Dakota v. Heydinger*, No. 11-3232 (SRN/SER), 2016 U.S. Dist. LEXIS 136007, at **82-83 (D. Minn. Sep. 29, 2016) (deducting over $29,000 "for Plaintiffs' time spent coordinating with supporting amici").[4] Thus, the Court has eliminated time billed for such tasks

---

work was not directly related to the presentation of the Plaintiff's case to any court." Doc. 57-13, ¶ 20.

[4] Neither of the cases that Plaintiff cites in arguing that fees for time spent reviewing amicus briefs supporting its position should be shifted are convincing. *Sharpe Holdings, Inc. v. United States HHS*, No. 12-092 DDN, 2015 U.S. Dist. LEXIS 78281, at *18 (E.D. Mo. June 17, 2015), discussed compensation for reviewing and replying to a brief submitted in *opposition* to the prevailing plaintiff's position. *Sharpe Holdings* does not address the question of whether fees for coordinating or reviewing amicus briefs *in support* of one's position are compensable. *Bishop v. Smith*, 112 F. Supp. 3d 1231, 1245-46 (N.D. Okla. 2015), rejected the rule articulated by the Eleventh Circuit in *Glassroth*, concluding that the Eleventh Circuit's reasoning was grounded in distate for amicus filings. Nonetheless, the District of Oklahoma agreed with *Glassroth's* conclusion that time spent "brainstorming potential amici, strategizing regarding potential amici, coordinating potential amici, soliciting potential amici, or drafting/editing an amicus brief" is not

as, "[p]repar[ing] presentation to a group of potential amici at the Heritage Foundation, then giv[ing] the presentation to the group." Doc. 57-2, p. 16.

5. *Time spent at the Supreme Court level researching basic legal issues with which the attorneys should have been familiar.* Plaintiff's counsel claim to be experts in First Amendment law. They also had fully briefed the issues presented in this case before this Court and the Eighth Circuit by the time that they reached the Supreme Court. Nonetheless, they continued to research and draft memoranda on such basic First Amendment topics as "Establishment Clause," "historical meaning of the establishment of religion," "free exercise," "Blaine Amendments," "government funding of religion," "special constitutional protection for religion," and "government subsidies to churches." *See, e.g.,* Doc. 57-2, pp. 14, 15, 17, 18, 25, 29. Similarly, after Plaintiff's initial brief was filed in the Supreme Court, but before Defendant's brief was filed, Plaintiff's counsel drafted a "memo on the motion to dismiss standard and how such motions are reviewed on appeal." *Id.*, p. 23. While attorneys may be expected to refresh research conducted in lower court proceedings to ensure that it remains up-to-date and that no additional relevant case law is available for citation, the Court sees no reason why Plaintiff's counsel should have spent approximately 200 hours at the Supreme Court stage researching topics they had already briefed and in which they should have been well-versed. The decision to conduct this basic research at the Supreme Court stage is all the more perplexing in light of the fact that the research and drafting of research memoranda continued well after the last Supreme Court brief was filed. *Compare id.*, p. 25 (August 10, 2016 entry: "Preparation of Reply Brief for Petitioner

---

compensable, and it also stated clearly that "[t]ime records related to amicus briefs should be highly specific or subject to exclusion." *See id.*, 1246. Thus, neither of these cases supports Plaintiff's position that time spent soliciting or coordinating supporting amicus briefs should be compensable, and to the extent that *Bishop* suggests that time spent reviewing supporting amicus briefs should be compensable, the Court finds the reasoning in *Glassroth* more convincing.

which is due to printer 8/11/2016") *with, e.g., id.* (August 11, 2016 entry: "Began working on memo regarding the types of government aid the S. Ct. has permitted and banned in regards to religious institutions"), *id.* (August 15, 2016 entry: "Began researching case law in which the S. Ct. recognized Establishment Clause jurisprudence has changed"), and *id.* (August 24, 2016 entry: "Began researching caselaw [*sic*] for memo regarding special constitutional protection for religion"). Plaintiff has not presented any explanation—let alone a reasonable, litigation-related purpose—as to why Plaintiff's counsel, who had thoroughly briefed the legal issues before the Supreme Court, and who had had the last word, continued to research and draft summaries of such concepts as "the types of government aid the S. Ct. has permitted and banned." *Id.*, p. 25 (August 12, 2016 entry). The Court has reduced such time by 50%—a conservative reduction, given the foregoing facts. To be clear, the Court did not reduce time for research that was expressly tied to drafting the briefs.

6. *Time spent reading every decision cited.* More than 14 months before the Supreme Court argument (and twelve days after the Supreme Court granted certiorari), Mr. Cortman began reading every single decision cited at any time in this case, apparently in alphabetical order, for approximately 200 total hours. *See, e.g., id.*, p. 15 (January 27, 2016 entry: "Read through all cases cited (Ashcroft v. Iqbal, . . . Bell Atl. v. Twombly . . . .)"); *id.*, p. 22 (June 3, 2016 entry: "Read all cases cited (Zelman, Zobel, Zobrest, Zorach) . . . ."). The task of reading relevant cases is of course reasonable. But Mr. Cortman did not exercise judgment as to which cases were likely to have relevance sufficient to justify shifting associated fees to Defendant. Further, by the time this case reached the Supreme Court, Plaintiff's counsel should have been familiar with the relevant case law, so the addition of hundreds of hours for review of such case law at that stage was unreasonable. Moreover, even if the task had been important for Plaintiff's Supreme Court

advocacy, it should have fallen in the first instance to less experienced—and less expensive—counsel. Mr. Cortman cannot claim significant expertise and command the highest billing rate in the case while having spent time reading cases concerning, for example, the motion to dismiss standard—an issue left far behind in this litigation by the time Mr. Cortman began reading cases. *See id.*, p. 15 (listing time for reading *Iqbal* and *Twombly*); *see also Miller v. Dugan*, 764 F.3d 826, 833 (8th Cir. 2014) ("The district court noted that [the attorney]'s normal hourly rate—proffered as reasonable in part due to his 'great deal of experience working on Civil Rights Act cases'—was inconsistent with the number of hours spent researching and preparing the motion and the reply."); *Planned Parenthood v. Miller*, 70 F.3d 517, 519 (8th Cir. 1995) ("The lawyers who actually appeared for the plaintiffs . . . do this kind of work routinely. They are leaders in the field of reproductive-rights law. They have extensive experience. Because of this, we believe they were able to handle the case in a shorter length of time than a local lawyer, without comparable experience, would have needed."); *Henderson v. Crimmins*, 147 F. Supp. 3d 780, 787-88 (N.D. Iowa 2015) ("A high hourly rate is warranted for someone with extensive experience, partially because it is expected that experienced practitioners will be more efficient with the use of their time. . . . [The attorney] should not claim a high hourly rate based on his alleged expertise, and then turn around and bill an excessive amount of hours, when this is another of the narrowly focused First Amendment cases he often handles."); *Brown*, 2010 U.S. Dist. LEXIS 52927, at **42-43 (reducing Mr. Cortman's fees by 50% after finding that, "[b]ased on Mr. Cortman's skill and experience with this case and numerous other similar matters, . . . 132.40 hours to prepare for the preliminary injunction hearing [wa]s not warranted"). At most, Mr. Cortman could have expected compensation for time spent reading only the most significant cases. Given Mr. Cortman's claim that his practice has focused on "religious freedom, freedom of expression, and

civil rights litigation," the Court reduced by 50% Mr. Cortman's time reading all—rather than a judicious selection—of the cases cited.

7. *Hours spent listening to oral argument in other cases*. Mr. Cortman has asked to be compensated for more than 100 hours he spent listening to oral arguments in various other Supreme Court cases. Familiarity with other Supreme Court advocacy on relevant subjects is the kind of knowledge and experience that is expected of one with Mr. Cortman's background. It is what paying clients would expect of an attorney commanding substantial hourly rates. Mr. Cortman has been awarded the highest billing rate in this case because of his claimed expertise in First Amendment issues and his experience in Supreme Court advocacy. He cannot demand a higher billing rate while taking as much time to prepare for the argument as would a far less experienced attorney with unlimited time. *See Miller*, 764 F.3d at 833; *Henderson v. Crimmins*, 147 F. Supp. 3d at 787-88; *Brown*, 2010 U.S. Dist. LEXIS 52927, at **42-43. Thus, notwithstanding Plaintiff's argument that there is no "better way to prepare for the[] difficult questions" that the Supreme Court puts forth "than listening to the questions asked, answers given, and the Court's responses in those prior related cases" (Doc. 65, p. 3), the Court approves only 50% of the time that Mr. Cortman spent listening to oral argument in various other cases.[5] There is no evidence that Mr. Cortman exercised billing judgment to decide which cases to listen to, and the fact that he listened to oral argument in such cases as *Loving v. Virginia*, *Bell Atlantic Corp. v. Twombly*, and *Ashcroft v. Iqbal* suggests that he was not selective. *See* Doc. 57-2, pp. 18 and 29.

---

[5] In the Court's experience, there is a much more useful and cost-effective way to prepare for difficult questions raised in oral argument: start with the facts and law relevant to the case being presented, and generate relevant questions or hypotheticals based on logic. Questions that other justices may have asked years before in other cases involving different facts and law are highly unlikely to be helpful. The Supreme Court briefs filed in this case, and the oral argument actually presented to the Supreme Court in this case, support the Court's conclusion.

8. *Entries with no apparent relevance to the case*. Plaintiff's counsel spent time reviewing filings from other cases or researching matters with no stated or apparent relevance to this case. For example, Mr. Cortman spent 5.6 hours reading the certiorari petitions and lower court opinions in a different case soon after the Supreme Court granted certiorari in this case. *Id.*, p. 15 (January 22, 2016 entry). Another attorney devoted some time to "[d]raft[ing] short memo on Pullman abstention"—a subject which had no apparent relevance to this case. *Id.*, p. 20 (April 4, 2016 entry). The Court has deducted all such time.

9. *Amount of time expended on a task was excessive*. The Court reduced time billed that seemed excessive for the listed task(s). For example, the Court has reduced Michael Whitehead's August 11, 2015 entry billing .9 hours for "Review" of an Eighth Circuit order consisting of three sentences. *Compare* Doc. 57-12, p. 20 *with* Eighth Circuit order, No. 14-1382, August 11, 2015 ("The petition for rehearing en banc is denied by an equally divided court. The petition for panel rehearing is also denied. Judges Riley, Smith, Colloton, Gruender and Shepherd would grant rehearing en banc."). Similarly, the Court has reduced the nearly 50 hours of time devoted to "Preparation of 2013-2017 receipts" (Doc. 57-2, p. 5) and the 46 hours devoted to "Preparation of Cert Petition Appendix" (Doc. 57-2, p. 8) by 50%. In a similar vein, in light of overstaffing, duplicative work, inefficiencies, and sheer excess time, the Court has reduced some of the time logged for revising the petition for certiorari and the Supreme Court appellant's brief and reply brief. From October 8 through October 28, 2015, three of Plaintiff's attorneys (Mr. Stanley, Mr. Gray, and Mr. Cortman) spent more than 50 hours on just drafting and editing the petition for certiorari (not including time for research, coordination, etc.). *See id.*, pp. 9-11. The Court has given full credit for the time spent drafting and revising the first six drafts of the petition

for certiorari, but has reduced by 50% time spent on the subsequent drafts. *See id.*, p. 11.[6]

Similarly, from February 3 through March 17, 2016, two of Plaintiff's attorneys (Mr. Stanley and Mr. Gray) spent more than 60 hours drafting and editing the Supreme Court merits brief (not including time for research, coordination, etc.). *See id.*, pp. 16-19. From March 21, 2016 onward, the Court reduced by 50% time spent drafting or editing the merits brief. Finally, from July 14 through August 7, 2016, four of Plaintiff's attorneys (Mr. Stanley, Mr. Gray, Mr. Cortman, and Mr. Lorence) spent more than 55 hours drafting and editing their Supreme Court reply merits brief (even after excluding time for research and coordination, etc.). *See id.*, pp. 23-24. Therefore, from August 8, 2016 onward, the Court reduced by 50% time spent drafting or editing that reply brief. *See, e.g., Poy v. Boutselis*, 92 F. App'x 5, 6 (1st Cir. 2004) (reducing total time spent on opening and reply appellate briefs to 40 and 42 hours respectively); *Michigan v. United States EPA*, 254 F.3d 1087, 1093 (D.C. Cir. 2001) (finding 20 hours billed for reply brief reasonable, but reducing by one half the 90 hours billed for the opening brief); *ACLU v. Barnes*, 168 F.3d 423, 433 (11th Cir. 1999) (reducing by nearly 50% the proposed hours for drafting three briefs, and permitting recovery for only 119.99 hours in total for those briefs); *see also El-Tabech v. Clarke*, 616 F.3d 834, 843-44 (8th Cir. 2010) (reducing time spent on fee request after finding that 77.7 hours "was excessive to prepare an application for the portions of the requests that were properly compensable").

10. *Duplicative work.* The Court similarly reduced time for patently duplicative work. For example, Mr. Gray billed twice for the task of reviewing respondent's brief. *Compare* Doc. 57-2, p. 22 (June 8, 2016 entry: "Reviewed Respondent's brief"), *with id.*, p. 23 (June 28, 2016

---

[6] There would be at least ten versions before the final petition was filed. *See id.* (November 2, 2015 entry).

entry: "Reviewed Respondent's Brief"). Mr. Lorence billed two-and-a-half hours to research how to apply for an extension of time in the Supreme Court—a subject that he had already researched. *Compare id.*, p. 16 (January 29, 2016 entry), *with id.*, p. 24 (July 21, 2016 entry). In one instance, Mr. Theriot billed four-and-a-half hours to "[r]esearch mootness and remedy issues"—research that attorneys who were most familiar with this case had already performed. *Compare id.*, p. 31 (April 16, 2017 entry), *with id.*, (April 13, 14, 15, and 16, 2017 entries). Plaintiff has not explained why an attorney who was new to the case and who expected a high billing rate was brought in to research an issue that other capable attorneys had already researched. The Court reduced the time for all such subsequent duplicative work by 50%.

11. *Unnecessary tasks.* The Court similarly reduced time spent on tasks that were not reasonably necessary to success in the litigation, such as Michael Whitehead's review of the already-filed corporate disclosure, notices of appearance, or bill of costs. Doc. 57-12, pp. 17 (February 24, 2014 entry) and 26 (August 10 and 11, 2017 entries). Plaintiff has not offered any explanation as to why its attorneys should be compensated for review of Plaintiff's own routine filings *after they were filed*.

12. *Vague entries.* Several entries lack sufficient detail to convey whether a given task was related to this case and whether it involved legal work. For example, multiple time entries from Jonathan Whitehead reference communications with other attorneys without specifying the subject. *See, e.g.,* Doc. 57-13, p. 8 (February 10, 2017 entry: "Email to D. Cortman, E. Stanley, M. Whitehead"); *id.*, p. 9 (April 14, 2017 entry: "multiple discussions with M. Whitehead"); *id.*, p. 10 (January 22, 2018 "email to M. Whitehead"). Similarly, Mr. Cortman and Mr. Stanley seek compensation for time spent meeting with their clients for hours just before and after oral argument at the Supreme Court, but they fail to specify the purpose of the meetings. *See* Doc. 57-2, p. 32.

While keeping clients apprised of legal developments is an important aspect of litigation, the Court struggles to conceive of a litigation-related purpose for Mr. Cortman's and Mr. Stanley's meeting with Trinity Lutheran representatives for more than two hours on the day before and the day of the argument at the Supreme Court. *See*, *e.g.*, *id.,* p. 32 (April 18, 2017 entry seeking compensation for 2-hour "meet[ing] with clients prior to Supreme Court argument"). Because Plaintiff bears the burden of establishing that the fees it seeks are reasonable, the attorneys' failure to submit sufficiently detailed descriptions for these entries warrants eliminating the associated time. *See, e.g., Craig v. District of Columbia*, 197 F. Supp. 3d 268, 280 (D.D.C. 2016) (finding "insufficiently detailed" "many entries perfunctorily stat[ing] that counsel 'e-mailed' or sent an 'email to' someone, had a 'phone discussion w/' someone, or 'reviewed and responded to' an e-mail or a document") (citing *In re Meese*, 907 F.2d 1192, 1204 (D.C. Cir. 1990); *In re Olson*, 884 F.2d 1415, 1428 (D.C. Cir. 1989)).

To the extent that any entry for which time was reduced was block-billed, the Court used its discretion in reducing the time, keeping in mind that Plaintiff bore the burden of demonstrating that the fees sought were reasonable. *See Hensley*, 461 U.S. at 433 ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly.").

*       *       *

In total, the Court has reduced the 1,862.60 total hours for which Plaintiffs' counsel requested compensation by 592.25 hours—or just under 31.8%. This reduction is justified for the reasons specified above, but also, more generally, because of Plaintiff's counsel's unconstrained approach to Supreme Court litigation compared to litigation in the lower courts. Plaintiff's counsel requested compensation for more than *seventeen times* more hours for its Supreme Court efforts than its efforts before the Eighth Circuit. *See* Doc. 57-1, p. 3 (requesting fees for 1,424.59 hours

before the Supreme Court); *id.*, p. 4 (requesting fees for 83.4 hours before Eighth Circuit); *id.*, p.

5 (requesting fees for 185.95 hours before this Court); *cf. American Civil Liberties Union of

Kentucky v. Mcreary*, No. 99-507, 2009 U.S. Dist. LEXIS 22206, at *10 (finding 200 hours of

time for writing Supreme Court brief and 200 hours of time preparing for Supreme Court argument

reasonable).[7] Mr. Cortman—who was not even the principal brief writer (*see* Doc. 57-4, ¶ 11

(Stanley Declaration stating that he "served as the principal brief writer"))—alone seeks

compensation for approximately 570 hours of work at the Supreme Court.[8] Plaintiff furnishes no

explanation as to why its efforts before the Supreme Court required more work, by orders of

magnitude, than its efforts before the Eighth Circuit (which included not only the initial appeal,

---

[7] Mr. Clement declared his belief that "the number of hours collectively reported by plaintiff's counsel for its efforts throughout this litigation—1,693.94 hours [as of the filing of the motion for fees]—is reasonable, as are the number of hours reported for ADF's efforts at the Supreme Court—1,290.99 hours." However, as a preliminary matter, Mr. Clement's figure for the number of hours expended at the Supreme Court is nearly 150 hours below the figure presented by the Plaintiffs, presumably because it does not account for the Whitehead attorneys' time. *See* Doc. 57-1, p. 3 ("Requested Fees for Supreme Court Efforts" listing "Requested Time" total as 1,424.59). Moreover, although Mr. Clement discusses the importance of this case and the rarity of grants of certiorari, he does not analyze the work that was performed in this case in particular, or even the work performed in Supreme Court cases generally. He does not, for example, explain whether it is standard for experienced Supreme Court practitioners to spend 100 hours listening to oral argument in various other cases, including some from more than 50 years ago, or to read every single case that was cited, regardless of whether the case was cited for an issue that will not be discussed at the Supreme Court, or to continue researching and drafting memoranda on generic constitutional law principles even after the Supreme Court case is fully briefed, or to prepare for and participate in fourteen different moot courts. In short, Mr. Clement's declaration concerning the hours billed is not only premised on a wrong assumption, but also conclusory, and therefore not helpful.

[8] In contrast, the attorney who argued the case before the Supreme Court for Defendant, Mr. Layton, spent just 176.25 hours preparing to argue the case before the Supreme Court. Doc. 63-1, ¶ 9. While not dispositive, this fact is further evidence that the hours that Plaintiff's counsel billed for its work before the Supreme Court were excessive. As the result of the Court's line-by-line reductions, ADF still will be compensated for 318 hours of Mr. Cortman's work, in addition to more than 500 hours of other ADF staff time, for the Supreme Court advocacy alone. *See Brown*, 2010 U.S. Dist. LEXIS 52927, at **42-43 (reducing Mr. Cortman's fees by 50% after finding that the time he purported to spend preparing for a hearing "[wa]s not warranted").

with briefing and argument, but also a petition for rehearing en banc). The parties' presentations in each court were remarkably similar,[9] and yet the discrepancies in time are startling. Supreme Court litigation is very important, but the Court sees no reason why it should take seventeen times more billable work. Even if Plaintiff's counsel believed that more than 1400 hours of work at the Supreme Court was reasonable and necessary to succeed, they had an obligation to exercise market-place billing judgment. *See, e.g., Hensley*, 461 U.S. at 433. Regardless of whether they feel they needed to expend time on all of the tasks they logged, the hours were not all reasonably compensable. The approximately 30% reduction in hours thus is fair.

### 3. Lodestar Calculation

With the adjustments to the billing rates and hours of Plaintiff's counsel discussed above, the lodestar calculation is as follows:

| Name | Hours Claimed | Hourly Rate Proposed | Hours Approved | Hourly Rate Approved | Total Fee |
|---|---|---|---|---|---|
| Christen Price | 20.9 | $150 | 11.95 | $150 | $1,792.50 |
| Christiana Holcomb | 70.6 | $200 | 67.9 | $200 | $13,580.00 |
| Cynthia Fisher (Legal Asst.) | 2.8 | $100 | 2.7 | $100 | $270.00 |
| David Cortman | 517.1 | $695 | 323.2 | $450 | $145,440.00 |
| Deb Hardin (Legal Asst.) | 135.5 | $100 | 85.3 | $100 | $8,530.00 |
| Erik Stanley | 399.9 | $495 | 320.9 | $325 | $104,292.50 |
| Jeremiah Galus | 55.8 | $350 | 52.55 | $275 | $14,451.25 |
| Joel Oster | 97.9 | $450 | 97.9 | $300 | $29,370.00 |
| Jonathan Whitehead | 87.8 | $300 | 53.4 | $250 | $13,350.00 |
| Jordan Lorence | 40 | $550 | 17.75 | $350 | $6,212.50 |
| Kevin Theriot | 14.8 | $550 | 2.8 | $325 | $910.00 |
| Michael Whitehead | 77.1 | $370 | 48.6 | $300 | $14,580.00 |

---

[9] The Court has reviewed the parties' briefing in the Supreme Court and the Eighth Circuit, and has reviewed again the briefing submitted on the motion to dismiss in this Court; the Court has also reviewed the argument before the Supreme Court. The issues that Plaintiff presented to the Supreme Court were largely the same as, or if anything, narrower than, the issues presented here and at the Eighth Circuit.

| | | | | | |
|---|---|---|---|---|---|
| Ray Kaselonis | 37.5 | $450 | 34.2 | $200 | $6,840.00 |
| Rory Gray | 247.8 | $350 | 151.2 | $275 | $41,580.00 |
| | | | **TOTAL FEE AWARD** | | $401,198.75 |

The Court finds that the fee produced through the lodestar calculation is fair. While this case was important, it was not unusually complex. The appeals arose from the Court's granting of a motion to dismiss. There was no evidentiary record at all, and the alleged facts were simple. The fact that Plaintiff prevailed before the Supreme Court does not transform an otherwise focused case into a complex one, and it certainly does not justify exorbitant fees.

Moreover, although Plaintiff's counsel have reduced the number of attorneys for whose work they seek fees, refraining from seeking compensation for those who billed fewer than ten hours to this case, they nonetheless seek payment for twelve different attorneys, along with two legal assistants. The disproportionate number of lawyers working on this relatively straightforward case necessarily created inefficiencies. Had a smaller team been employed, there would have been fewer internal communications and less time spent by various attorneys to familiarize themselves with the case. Plaintiffs have not presented any explanation for the large number of attorneys, and the Court does not believe that any paying client would have tolerated paying fees for such a large team to work on a straightforward matter. For these reasons, the Court will not adjust the lodestar figure upward.[10]

### b. **Expenses**

Counsel to a prevailing party in a § 1983 action is entitled to an award reimbursing

---

[10] The lodestar calculation also permits the Court to consider Plaintiff's limited success on the merits. Although Defendant had a basis for raising this issue, *see Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.3 (2017), she has chosen not to, and therefore the Court makes no adjustment to the Lodestar.

reasonable expenses of the kind normally charged to clients by attorneys. *See Williams v. ConAgra Poultry Co.*, 113 F. App'x 725, 728 (8th Cir. 2004) (noting that "travel expenses for attorneys" and other "expenses that a law firm normally would bill to its client" are "properly characterized as part of an attorney's fees award"); *Sapa Najin v. Gunter*, 857 F.2d 463, 465 (8th Cir. 1988) ("Reasonable expenses of litigation incurred by counsel on the prevailing side can be awarded as part of the fees due under Section 1988.").

Trinity Lutheran seeks $51,548.53 in costs, for the following categories of items: litigation fees (including filing and service-of-process fees), conference calls, deposition cancelation fees, shipping, transcripts, printing, meals, transportation (mileage, gas, parking, rental car, airfare, laundry), and lodging. The Court, having reviewed the itemized lists of expenses filed by Plaintiff, finds that several of the expenses for which Plaintiff's counsel seek reimbursement would not properly be billed to a client and therefore will not be imposed on Defendant. First, the Court will not charge Defendant for Plaintiff's counsel's air travel for meetings with clients. Most paying clients would not condone cross-country travel by counsel for ordinary client meetings. There is no indication in the record that the client meetings were for deposition preparation, document collection, or some other litigation-related purpose that might be better accomplished through an in-person meeting.

The Court also will not shift expenses for snacks for those meetings (or for other purposes). Similarly, the Court will not shift expenses for client dinners.[11]

The Court will not shift expenses for shipping documents from one ADF office to another.

---

[11] Trinity Lutheran has already withdrawn its request for reimbursement of a particularly expensive steak dinner with clients and reduced the amount of certain exorbitant car service bills. *See* Doc. 65, p. 9 and n.6. However, as discussed further below, it did not go far enough in eliminating unreasonable expenses.

Organizations with multiple offices—both private and public—have interoffice parcel services, costs for which are considered overhead, and for which attorneys do not bill clients. It would be inappropriate to shift such costs. In the same vein, the Court will not tax the cost of a printer or ink—administrative expenses that ordinarily are considered overhead and would not be billed to a client.

In keeping with the Court's decision to eliminate fees for all but the last four moot courts, the Court has struck expenses relating to travel for all but the four approved moot courts.

The Court will not shift the costs and expenses attributable to client travel. Such expenses would not ordinarily be advanced by an attorney for a client to reimburse and therefore are not recoverable. *See Bunnett & Co. v. Dores*, No. 15-1104, 2018 U.S. Dist. LEXIS 153373, at **20-21 (W.D. Tex. Sep. 7, 2018) ("Bunnett seeks the travel expenses for JJ Bunnett to attend various proceedings in the Dores bankruptcy litigation as well as in these contempt proceedings. Gearheart objects, noting that these travel costs are not 'attorney's fees and costs.' The Court agrees. A client's travel costs are not something the attorney pays."); *Smith v. LexisNexis Screening Sols., Inc.*, No. 13-10774, 2015 U.S. Dist. LEXIS 172008, at **22-23 (E.D. Mich. Dec. 28, 2015) ([T]he logic underlying Plaintiff's counsel's recovery of travel expenses — that it is an out-of-pocket expense typically charged to a fee-paying client — is inapplicable to the client's travel expenses, because such costs are typically incurred by the client in the first instance, and would not show up on an attorney's bill. Therefore, to the extent that Plaintiff's counsel's request for travel expenses encompasses costs attributed to Plaintiff's travel, not his counsel's, that request is denied.") (citing *Calderon v. Witvoet*, 112 F.3d 275, 276 (7th Cir. 1997) (holding that client's travel costs are not reimbursable as part of an award for attorney fees "because the expense of a litigant's travel does not appear on an attorney's bill")).

Finally, the Court finds that "laundry" is not a reasonable expense billable to a client, let alone to the other party in litigation.

In total, after review of each listed expense, the Court reduced the $53,840.08 claimed to $32,593.21.

## II. **CONCLUSION**

For the reasons discussed above, the Court grants in part and denies in part the motion for fees. The Court awards to Plaintiff's counsel a total of $433,791.96, comprised of $401,198.75 in fees ($372,998.75 for ADF, $14,850.00 for Michael Whitehead's firm, and $13,350.00 for Jonathan Whitehead's firm) and $32,593.21 in attorney expenses and costs ($30,425.86 for ADF, $975.14 for Michael Whitehead's firm, and $1192.21 for Jonathan Whitehead's firm).

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  November 7, 2018
Jefferson City, Missouri